BATTLE CREEK FOOD CO. v. KIRKLAND.

1. EQUITY—FRAUD—DISCRETION OF COURT—EVIDENCE.
    In an equity case involving questions of fraud, much is left to the discretion of the trial judge in admitting testimony and the order of admission.

2. TRIAL—COMMENT OF JUDGE—CREDIBILITY OF WITNESSES.
    In suit in equity for accounting in which questions of fraud were involved, it was proper for the trial judge to comment upon the manner in which the answers of defendants were given when testifying as far as it affects the credibility of witnesses.

Liability in damages for nondisclosure in a business transaction, see 3 Restatement, Torts, § 551.

3. APPEAL AND ERROR—EQUITY CASE—REVIEW DE NOVO.

While the Supreme Court respects the views of the trial judge in an equity case involving questions of fraud, it examines the entire record *de novo*.

4. CORPORATIONS—ACCOUNTING—BROKERAGE—FINDINGS OF TRIAL COURT—EVIDENCE.

In corporation's suit against its manager, sales manager and chief accountant, employees who occupied positions of trust, for an accounting and repayment of brokerage fees and profits by firm they organized which handled plaintiff's food products, the proper testimony was sufficient to sustain the findings of the trial judge.

5. WITNESSES—USE OF MEMORANDA.

An essential requirement in using memoranda to revive the present recollection of a witness who testifies therefrom is the necessity to resort to memoranda to refresh the memory.

6. SAME—MEMORANDA USED TO REFRESH RECOLLECTION NEED NOT BE PLACED IN EVIDENCE.

Memoranda or notes, used to refresh a witness' recollection, need not be placed in evidence, since it is the recollection and not the memoranda that is the evidence.

7. DEPOSITIONS—LEADING QUESTIONS—DISCRETION OF COURT.

In corporation's suit against three employees, who occupied positions of trust, for an accounting and repayment of moneys received from plaintiff by brokerage firm they had organized to handle corporation's food products, admission in evidence of deposition of 87-year-old sole stockholder, containing leading questions as to what took place at the time and shortly after he charged defendants with fraud, their alleged admissions that they had been guilty of wrongdoing, and their alleged statements that they were willing to make restitution, rested in the trial court's discretion.

8. CORPORATIONS—ACCOUNTING—TRUSTED EMPLOYEES—PRIMA FACIE CASE.

In corporation's suit against three employees, who occupied positions of trust, for an accounting and repayment of moneys received from plaintiff by brokerage firm they had organized to handle corporation's food products, testimony that two defendants admitted their wrongdoing to sole stockholder of plaintiff corporation and agreed to make restitution and that third employee was present part of the time but offered no denial or objections when the admissions of guilt were made and restitution discussed, together with testimony of the aged

stockholder not gained through the use of leading questions, made a prima facie case.

9. APPEAL AND ERROR—COMPROMISE—EVIDENCE.

In corporation's suit against three employees, who occupied positions of trust, for an accounting and repayment of moneys received from plaintiff by brokerage firm they had organized to handle corporation's food products, unexecuted document introduced by defendants whereby defendants agreed to repay profits of brokerage firm together with interest in consideration of plaintiff's release from all claims was not inadmissible as an offer in compromise where defendants admit it was not drawn to settle a suit.

10. CORPORATIONS—BROKERS—ACCOUNTING BY TRUSTED EMPLOYEES—CONSENT—DISCLOSURE.

Even though consent of sole stockholder of plaintiff corporation was obtained to the formation by defendants, employees who occupied positions of trust with plaintiff, of a brokerage firm to handle plaintiff's food products in a certain city and area, evidence requires finding there was not a full disclosure in that all material facts were not communicated to such stockholder; hence plaintiff was not precluded from demanding an accounting for receipts from it by brokerage firm.

11. APPEAL AND ERROR—CONFLICTING EVIDENCE—CREDIBILITY OF WITNESSES—FINDING OF TRIAL COURT.

In corporation's suit for accounting as to receipts from it by brokerage firm, organized by three employees who occupied positions of trust to handle plaintiff's food products, where testimony was highly conflicting, the trial judge's conclusions based on testimony by plaintiff's witnesses is not disturbed as he had a better opportunity to observe the witnesses.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted April 10, 1941. (Docket No. 43, Calendar No. 41,518.) Decided June 30, 1941.

Bill by Battle Creek Food Company, a corporation, against Bertram C. Kirkland, E. Roy Saxton, and Frank W. LeFevre for an accounting of funds of plaintiff converted to their use by fraudulent conspiracy and for other relief. Decree for plaintiff. Defendants appeal. Affirmed.

*Hamilton, Cleary, Storkan & Vandervoort (Kim Sigler,* of counsel), for plaintiff.

*Joseph W. McAuliffe (Allen & North,* of counsel), for defendants.

Butzel, J. Plaintiff Battle Creek Food Company, a Michigan corporation, is engaged in the manufacture and sale of food products. Its entire capital stock was owned by Dr. John H. Kellogg of Battle Creek, Michigan, and with the exception of a few qualifying shares, stood in his name. He was president and director of the company. Although it is asserted and in a way conceded that profits in the way of dividends from the plaintiff company were turned over by Dr. Kellogg to finance certain eleemosynary organizations, Dr. Kellogg was the sole owner of the stock in plaintiff company, which is a proper plaintiff in this suit.

For many years, including 1928, and successive years thereafter, because of his health and also in order to look after the affairs of the Miami Battle Creek Sanitarium which he owned, Dr. Kellogg spent a large part of the year in Florida. While in Battle Creek, Dr. Kellogg supervised plaintiff company and the other institutions. How he divided his time between his various interests is not shown. Plaintiff company was managed by defendant Bertram C. Kirkland, who was married to an adopted daughter of Dr. Kellogg. Kirkland began working for plaintiff in 1909. He was promoted from time to time and became manager and director of the company. In 1928, when the transactions complained of began, he was receiving an annual salary of $17,010; in 1930, it was increased to $19,845. It was reduced slightly the following year and after that very substantially. Defendant E. Roy Saxton,

after being with the company many years, became its sales manager in 1921. His salary for 1928 was $9,921; in 1930, it had been raised to $11,340, then it fluctuated, and in 1933, it was materially reduced. Defendant Frank W. LeFevre also had been promoted from time to time and became chief accountant. His salary in 1928 was $7,086.75; in 1930, $8,505, and later it was reduced. Reduction in the salaries was solely due to poor business conditions, during the depression years, and not to any fault or shortcomings of defendants. Dr. Kellogg placed his entire confidence in the three defendants. They were to a very large degree in complete charge of plaintiff. They owed it their full time, effort and faithful devotion. They occupied positions of trust.

In 1928, the company did a large part of its business with customers direct from the home office in Battle Creek. It also had four branch offices in Seattle, Los Angeles, Boston and New York City, from each of which a large amount of territory was serviced. Orders were sent to the branch offices by customers in that territory and also some were sent there by the home office in Battle Creek. Brokers' offices represented plaintiff in many focal points throughout the country. Such offices in large centers like Philadelphia, Atlanta, St. Louis, Cleveland, Baltimore, Indianapolis, et cetera, each served local and neighboring territory. For instance, the Atlanta office serviced over five southern States; St. Louis serviced southern Illinois, northern Arkansas, Kansas, Oklahoma, and other territory. Prior to August 1, 1928, plaintiff rented part of a warehouse in Chicago. It kept a special salesman in Chicago, as well as others in the neighboring territory. As orders were received in Battle Creek for Chicago, northern Illinois, Wisconsin, Minnesota, North and South Dakota, Iowa, and certain other territory, the

orders were approved by the credit department and sent to Chicago where shipments, as a rule, were made from the Chicago warehouse and the freight paid for on a traffic basis. Plaintiff at all times at its own expense, both before and after 1928, maintained a large staff of salesmen and demonstrators throughout the country, including the Chicago territory. Plaintiff also furnished stationery, and order blanks, and paid the expense of warehousing the products in Chicago and the freight and cartage charges.

On or about August 1, 1928, the three defendants organized the Midstates Sales, a copartnership, for the purpose of engaging in the food brokerage business in Chicago, Illinois. The capital of the firm was placed at $800, of which Kirkland and Saxton agreed to furnish $320 each and LeFevre $160. The latter was to receive 20 per cent. of the profits, while the other two were each to receive 40 per cent. The division subsequently was changed so as to give each partner one-third of the profits. The Chicago office was to be operated by a manager appointed and instructed by the partners, each of whom was to give his services without compensation except as might thereafter be agreed upon in writing. While the purpose of the copartnership, as stated in the partnership agreement, was to sell food products, it was but a short time before it handled principally, if not exclusively, plaintiff's products. Defendants placed a young man 21 years of age in charge of the Chicago office. He had been an accountant and rug salesman and was wholly inexperienced in the food business. It appears that defendants' work in regard to the Chicago office was almost negligible. They remained full time employees of plaintiff and, as such, it was their duty to do whatever was for the best interest of plaintiff.

This included the sale and distribution of goods throughout the United States in the most efficient and economical manner possible. Defendants' Chicago office first received a brokerage fee of 4 per cent. for the business handled by it, but this was reduced to 3 per cent. The fees were the same as were paid to other brokers. Defendants, or some of them, gradually closed many of the other brokerage offices handling plaintiff's products. The St. Louis brokerage office, after being notified of the loss of the agency, was so eager to keep the account that it offered to accept a brokerage of 2 per cent., but defendants claim that for the good of the plaintiff the business was diverted to the Chicago office, that the latter would effect a saving of time and cost in transportation, the goods would be delivered in a fresher state, and that both time and money could be saved in package freight by making Chicago a central point for shipments. Defendants claim they effected a substantial savings amounting to 25 per cent. in the warehousing costs in Chicago. Immediately upon the formation of Midstates Sales, defendants discontinued the factory and warehouse service formerly conducted in Chicago by plaintiff and took over the brokerage service in the States of northern Illinois, Michigan, Wisconsin, Minnesota, North and South Dakota, parts of Montana, Colorado, all of Nebraska, Iowa, Texas, Louisiana and Mississippi. In their seat of authority in Battle Creek they gradually discontinued many of the other brokerage offices so that gradually the territory thus serviced by Midstates Sales covered approximately over half of the United States. The Chicago office employed no salesmen or demonstrators whatsoever. Again assuming that defendants after the formation of the company effected a savings in the warehousing and freight charges, which

plaintiff continued to pay, and a savings of time in the delivery of goods, they did just what they should have done for plaintiff as its officers and without the intervention of Midstates Sales, a so-called entity consisting of themselves.

Plaintiff furnished the stationery for all the brokerage offices and, accordingly, defendants directed plaintiff to print envelopes addressed to the Battle Creek Food Company, care of the Midstates Sales, at the latter's Chicago address for the use of customers, and in one instance, at least, the printed envelopes were addressed to plaintiff at the Chicago address without Midstates Sales even being mentioned. The little time that defendants could have given to the office is illustrated by the fact that when Dr. Kellogg inquired of Kirkland where the Chicago office was located, he first had to look it up before he could give the information. There is no claim made that the Chicago manager obtained any orders nor that Midstates Sales was put to any expense in obtaining orders. Up to and including part of 1936, defendants collected and divided between themselves for brokerage fees the sum of $96,516.33. There never was any action on the part of plaintiff's board of directors authorizing the Chicago office. It is alleged and claimed by Dr. Kellogg that all this was done without the knowledge and consent of the stockholders, he being the sole stockholder; that the entire transactions were fraudulent and kept secret from him; that it was a scheme fraudulently devised and secretly carried out to divert profits from plaintiff. It is claimed that the very method pursued by defendants from the start showed the secrecy with which the scheme was carried out. Books were kept at the homes of defendants Saxton and LeFevre. We pay no attention to the fact stressed by plaintiff that neither

a partnership or assumed name certificate was filed by defendants. There is no provision in the Illinois law requiring such certificate, and no business of the partnership was transacted in Battle Creek except the sending of the orders and goods to Chicago and the division of brokerage fees and the keeping of the books at the homes of Saxton and LeFevre. The method of dividing the profits, however, suggests secrecy. A check was made out by defendant Saxton on Midstates Sales' Chicago depository, which, in turn, in accordance with Saxton's instructions, issued separate drafts or credits respectively to each of the three defendants. The one fact, however, that stands out in the entire case, is that defendants, full-time employees, occupying positions of highest responsibility to plaintiff, were receiving additional profits from the company for practically no consideration whatsoever. Even if the work they did was not negligible in amount, they did only what they were bound to do as managers and officers and agents of plaintiff.

Defendants, on the other hand, claim that in 1928 they were anxious to increase their incomes and importuned Dr. Kellogg for a larger share in the growing profits of the business; that Dr. Kellogg a short time previously had contemplated the formation of a chain of health food restaurants and offered defendants the opportunity to invest; that this was never organized, and shortly thereafter, and then in a very brief conversation with Dr. Kellogg, they told him of their desire to open a brokerage office in Chicago and that he was willing that they do it. They further claimed that from time to time he was told of the existence of the office and payment of brokerage fees, and further had notice of it but offered no objections. Defendants also claim that Dr. Kellogg originally consented to the

opening of a brokerage office in Chicago in lieu of raises in salary that they sought. However, in 1930, they each received a substantial raise in salary. This apparent inconsistency they attempt to explain by their testimony to the effect that in 1930 plaintiff company negotiated to sell out its business for a very large sum of money, that the sale was not consummated, and they claim that when discussion arose as to their relative positions, the small share they were receiving from the profits, et cetera, Dr. Kellogg consented to the raise of salaries.

Dr. Kellogg made a visit to the Chicago office several years after it was opened, after first asking defendant Kirkland the address. Defendants claim that when the Doctor went there, the name "Midstates Sales" was prominently displayed on the door as well as that of plaintiff in smaller letters on the lower part of the door; that Dr. Kellogg must have known that the office in Chicago was a brokerage office as the reports sent to him in Florida from time to time showed that the brokerage charges were paid; that there was no objection at all made until after the depression and after Dr. Kellogg had become very "hard up," and that in his desire to secure moneys he devised the method of making claims of fraudulent diversion of moneys from plaintiff; that he offered 25 per cent. as a bonus to all employees if they would assist in helping him recover from defendants and in this way silenced the employees; that the brokerage office was conducted so openly and was so well known to everyone that it also must have come to the knowledge of Dr. Kellogg, who watched his business matters very carefully; that Dr. Kellogg did tell others of the brokerage company. Defendants admit that there was no written authority given to them and that the conversation with Dr. Kellogg in which he con-

sented lasted only three or four minutes, and that it was rather casual and not formal. They, however, claim that when they told Dr. Kellogg of their desire to open brokerage offices, he suggested one in Chicago where they could handle plaintiff's products and be entitled to a brokerage fee of 4 per cent. Dr. Kellogg, on the other hand, claims that he knew nothing at all about the fact that defendants were securing profits from the Chicago office; it was only when he put in a new auditor and secured a report from a commercial agency that he first learned of defendants' alleged duplicity, fraud and misappropriation, and shortly thereafter plaintiff filed the bill of complaint in the instant case, demanding an accounting and repayment of all sums taken or received by defendants for brokerage or profits together with interest at the rate of 5 per cent. per annum.

The trial judge spent weeks taking testimony. In addition to this, Dr. Kellogg's testimony, both direct and rebuttal, was taken by deposition in Florida. The testimony of some of the witnesses for defendants was taken by deposition. The trial judge in a lengthy opinion held in favor of plaintiff, and defendants appeal from the decree entered herein.

It would serve no useful purpose to detail all of the testimony and contentions contained in a record of four volumes. Many questions arose in regard to the admissibility of testimony and particularly as to the manner in which some of it was taken. Even were defendants correct in their contentions, as to the admissibility of some of the testimony and the order in which it was received, we believe that there is sufficient proper testimony to sustain the findings of the trial judge. This is an equity case involving questions of fraud, and frequently more leeway is

allowed in admitting testimony and the order of admission than in an ordinary case. Much is left to the trial judge's discretion. The judges both in the trial court and the appellate court can cull out the bad from the good. The trial judge, however, commented upon the motives of the witnesses and particularly the manner in which the testimony for defendants was given. He had an opportunity which we do not have to judge the credibility of witnesses. The trial judge in making his findings stated, referring to the three defendants:

"It was apparent from their manner and demeanor on the witness stand and the reluctant and hesitating manner in which they testified that they were not telling the whole truth and nothing but the truth."

We shall not analyze all the testimony but we find that some of the testimony given by defendants justified the statements by the trial judge. It was proper for him to comment upon the manner in which the answers were given as far as it affects the credibility of witnesses. It is true that the trial judge did not hear the testimony of Dr. Kellogg when it was taken on deposition and that he did comment about Dr. Kellogg's position and reputation. A trial judge in a community where people are well known might possibly be influenced by his knowledge of people. In an appellate court, while we respect the views of the trial judge, we examine the entire record *de novo*. The corroboration of Dr. Kellogg's testimony by the various witnesses as to defendants' guilt and willingness to make restitution leads us to the conclusion that the trial court reached the correct result.

Error is claimed because in taking Dr. Kellogg's deposition in Florida many of the questions and

answers were in the form of leading questions. There were many leading questions asked of Dr. Kellogg as to what took place at the time and shortly after he charged defendants with fraud and their alleged admissions that they had been guilty of wrongdoing in opening the office without Dr. Kellogg's consent and their alleged statements that they were willing to make restitution. In the deposition of Dr. Kellogg, over 80 pages consisted of direct questions and answers, though interrupted by many objections. Then there follows about as many pages of questions in which, in order to refresh his recollection, Dr. Kellogg is asked questions that are read from notes in some manner received or prepared by his counsel. The questions in the main referred to interviews that took place after the fraud was discovered. Dr. Kellogg repeatedly was asked whether he did not put certain questions to defendants and whether certain replies were not made. Dr. Kellogg's answers were in the affirmative. At the time of the taking of his deposition in Florida, Dr. Kellogg was 87 years of age. The questions asked referred to crowded interviews that occurred two and one-half years prior to the time of the taking of the deposition. The objections made to the leading questions would be far more forceful in a law case, particularly before a jury, than in an equity case. An essential requirement in using memoranda to revive the present recollection of a witness who testifies therefrom is the necessity to resort to memoranda to refresh the memory. *Bashford* v. *People,* 24 Mich. 244; *Weaver* v. *Bromley,* 65 Mich. 212. The Doctor first testified to all that he could independently recall of the conversations held with defendants. After he had exhausted his recollection, the leading questions were resorted to as a means of refreshing his recollec-

tion. It was not necessary to place the memoranda or notes in evidence by plaintiff's counsel, since it is the recollection and not the memoranda that is the evidence. See notes in 125 A. L. R. 65, which cites *Caldwell* v. *Bowen*, 80 Mich. 382; *Koehler* v. *Abey*, 168 Mich. 113; *Grusiecki* v. *Jaglay*, 260 Mich. 9. This rule is laid down by the textbook writers and was followed in *Dillon* v. *Pinch*, 110 Mich. 149; *Stone* v. *Standard Life & Accident Ins. Co.*, 71 Mich. 81; *Cairbre* v. *McQuillen*, 162 Mich. 679. In *Dillon* v. *Pinch, supra*, 152, the court said:

"In order to refresh his recollection, Mr. Hatch was asked if he did not say to Mr. Stine, in that conversation, that defendant said to Dillon that he had not intended to charge him much, if anything, for getting the money, but now he would make it cost him as much as he could. The question was answered, under the objection that it was leading and incompetent. The witness replied that he thought something of that kind was said, but he could not remember the exact words. The testimony was not offered or received or used for the purpose of impeachment, but solely for the purpose of refreshing his recollection. We think the question rested in the sound discretion of the circuit judge, and that no error was committed in allowing it."

In *Stone* v. *Standard Life & Accident Ins. Co., supra*, 85 the court again said:

"For the purpose of refreshing his recollection, it was not improper to call his attention to statements made by him at or about the time he made his observations."

The admission of the testimony objected to rested in the trial court's sound discretion. However, even without the questions asked to refresh the witnesses' recollection, a prima facie case was made out by Dr.

Kellogg's examination and the testimony of Mrs. Josephine W. Wattis, who testified that she overheard part of the interviews Dr. Kellogg had with defendants and in which he claims they admitted their alleged wrongdoing. The testimony shows that when Dr. Kellogg learned about the fraud, he first interviewed defendant Saxton who, after giving untrue answers, finally broke down and admitted his wrongdoing and asked for an opportunity to make restitution; that, likewise, defendant Kirkland also admitted his wrongdoing and agreed to make restitution; that defendant LeFevre was present part of the time but offered no denial or objections when the admissions of guilt were made by defendant Kirkland and restitution was discussed. He did say that the Doctor was exacting hard punishment.

When Dr. Kellogg was pressing defendants in no uncertain manner and accusing them of being criminally as well as civilly liable, they counseled with the late Bernard J. Onen, a lawyer of the highest standing and ability and well and most favorably known to bench and bar.

The following document was introduced in evidence not by plaintiff but by defendants:

"Battle Creek, Michigan
September 10, 1936
"To Battle Creek Food Company
Battle Creek, Michigan
"Gentlemen:
"Whereas, you claim that on or about August 1, 1928, the undersigned organized in the City of Chicago, Illinois, a partnership known as Midstates Sales, for the purpose of acting as brokers of the foods manufactured by the Battle Creek Food Company and have since that date conducted such brokerage business without the knowledge of your

company, which latter fact we deny, but in view of your claim and rather than to have any litigation we are willing to repay to you the profits of said Midstates Sales amounting to approximately $95,000, together with interest thereon at the rate of 5 per cent., in consideration of which you shall release us, and each of us, from all claims, demands and obligations of every kind and nature.

"Of said principal amount, each of us agrees to pay the amount set opposite our name.

.............................. $..............

.............................. $..............

.............................. $..............

"We hereby accept the above offer.

THE BATTLE CREEK FOOD COMPANY

By ..................................

Its President."

This document was prepared by Mr. Onen and it played some part in one of the interviews between the parties after the charges were preferred by Dr. Kellogg. The trial judge placed considerable significance on this document. He held:

"The paper itself does not signify that it was a compromise agreement, but a settlement agreement as it agrees to pay back all that the defendants obtained by means of said alleged brokerage firm. I cannot conceive that an attorney of B. J. Onen's ability and reputation would have drawn such a paper for the purpose for which defendants seek to convince the court it was drawn. The instrument speaks for itself and the fact that any attorney of Mr. Onen's standing drew the same, after listening to defendants, and allowed them to present the same to Dr. Kellogg seems to be a rather convincing argument that the defendants were guilty of some wrongdoing in the operation of Midstates Sales."

Defendants claimed that it was not admissible as being an offer in compromise. It was not accepted

by Dr. Kellogg nor signed by them. If it had been executed by the parties, it probably would have ended the litigation. Defendants claimed that they did not know whether Dr. Kellogg was in earnest or just what he was after and the document was prepared to try Dr. Kellogg out and that they had no intention of signing it. They further claim that they did not present the document to Dr. Kellogg but that he took it from them. Defendants take the position in their brief that the document was not drawn to settle any lawsuit, as it purports to pay the total profits of Midstates Sales plus the accrued interest. As the defendants themselves admit in their brief that it was not drawn to settle a suit and they offered the document themselves although sorely pressed to do so, the document was admissible for whatever it is worth.

We believe the case is one where much depends upon the credibility of the witnesses. Statements on behalf of plaintiff are categorically denied by defendants and vice versa. Were it not for the testimony in regard to the admissions of guilt and offers of restitution, we would be very much perplexed. We are confronted with testimony of defendants' witnesses, purporting to show that Dr. Kellogg gave his consent to the creation of the agency, did know, or at least must have known of it during the subsequent years in which it operated, so that even if the latter only be true, a large part of the claim would be outlawed. On the other hand, there is the testimony not only of Dr. Kellogg and Mrs. Wattis, but also the further corroborative testimony of other witnesses, including Drs. Martin and Case, as to defendants' admissions of guilt and offer to make restitution.

The trial judge considered and analyzed the testimony of each of the witnesses for defendant and

found that it lacked probative value as to the main issue. The corroborative testimony of a former auditor would have been most damaging to plaintiff's case were it not for possible bias, his friendship with one of the defendants, his lack of knowledge of an important detail, and a natural reason for not feeling friendly towards Dr. Kellogg, who had found fault with the auditor's work and also charged that the auditor had neglected to learn and disclose to Dr. Kellogg material facts that constitute the basis of this litigation. The auditor's testimony was also taken by deposition but it was insufficient with that of the others to overcome the testimony in regard to straight admissions of guilt made by defendants as hereinbefore set forth.

The judge properly commented upon the fact that even if Dr. Kellogg in a conversation was told that defendants were opening a food brokerage business in Chicago, there was not a full and further disclosure to him showing that they had not only opened a food brokerage business but that they diverted a good part of the business of the country to the Chicago office, which thus collected brokerage fees on plaintiff's business in a large portion of the United States.

The copartnership agreement of Midstates Sales was dated August 1, 1928. That very month the brokerage fees taken by defendants amounted to $1,429.35. This sum must have come for brokerage on sales made without any effort whatsoever by defendants. It is difficult to find anything they did that they were not bound to do in the interests of the company had not Midstates Sales been organized by them.

Even assuming defendants' statements to be true as to the original consent by Dr. Kellogg to the

opening of a brokerage company by defendants, there was no reasonable effort on the part of defendants to inform Dr. Kellogg of their purpose to take commissions immediately upon plaintiff's established business in over a dozen States where no commissions had theretofore been paid by plaintiff; nor did they disclose to him that they expected to take over this territory without cost and without doing anything substantial themselves to promote sales; nor did they disclose at any time that they purposed terminating established brokerage agencies so that they could collect brokerage fees on all goods sold in such territory; nor were other pertinent facts relating to the alleged agency disclosed. Defendants claim such disclosure was not necessary as the other brokers had the benefit of plaintiff's demonstrators, salesmen, et cetera; that the closing of the other agencies was in the interest of plaintiff; Dr. Kellogg should have seen items of payment of large brokerage fees on reports sent to him; that the conduct of the agency was in accordance with the method theretofore used by plaintiff's other brokers in large centers, and closing up the other agencies and centralizing brokerage and shipments in the Chicago office was all for the good of plaintiff, notwithstanding the fact that the St. Louis brokers offered to continue the agency at a 2 per cent. brokerage fee instead of the 3 per cent. that defendants collected. They further claim that the entire demand of plaintiff was simply an effort on the part of Dr. Kellogg, when he became "hard up," to recapture moneys that the defendants claimed they legitimately collected; that such demand did not occur until plaintiff was very "hard up" and was looking for ways and means of relieving his distress financially, a condition due to the depression.

We do not believe that there was full disclosure in that defendants did not communicate to plaintiff all the material facts in connection with the transactions. See cases assembled on pages 736 and 737 in *Stephenson* v. *Golden,* 279 Mich. 710; also, see 2 Restatement, Agency, § 381, p. 844.

It is impossible to discuss all of the testimony within this opinion. We have discussed only what we deem the most important questions. In the last analysis, however, the main questions are issues of fact. Any doubt that might be entertained in regard to what occurred prior to 1936 is completely dispelled by the witnesses of plaintiff who testified to complete admissions and offers to make restitution of defendants. There is such a conflict of testimony that the ultimate decision is largely governed by the credibility of the witnesses. The trial judge had a better opportunity to determine this than we have, and from a reading of the record, we believe that the findings of fact are fully sustained by the record. The trial judge came to the conclusion that he believed the witnesses for plaintiff and not those of defendant. We concur in his findings.

The decree of the trial court is affirmed, with costs to plaintiff.

SHARPE, C. J., and BUSHNELL, BOYLES, and CHANDLER, JJ., concurred with BUTZEL, J. WIEST, J., concurred in the result. NORTH, J., did not sit. McALLISTER, J., took no part in this decision.