PEOPLE v. SHAW.

SEARCHES AND SEIZURES—WITHOUT WARRANT—WAIVER—CONSENT—
PRESUMPTION—TESTIMONY.

> Waiver or consent to a search without a warrant must be proved
> by clear and positive testimony to rebut the presumption
> against waiver; where the people's proof of consent to a
> search of defendant's car is confined to one detective's testi-
> mony which discloses conflict in regard to a seizure of a
> defendant's car by police and the subsequent search of the
> car, and other testimony was available which might support
> either defendant's disclaimer of consent or the detective's
> testimony that consent was given, the proof is not clear
> and positive.

Appeal from Court of Appeals, Division 1, J. H.
Gillis, P. J., and T. G. Kavanagh and Weipert, JJ.,
reversing Recorder's Court of Detroit, Frank G.
Schemanske, J. Submitted November 4, 1969. (Cal-
endar No. 13, Docket No. 52,083.) Decided January
12, 1970.

9 Mich App 558, affirmed.

Ulysses Grant Shaw was convicted of murder in
the first degree. Defendant appealed to the Court
of Appeals. Conviction vacated and cause remanded
for a new trial. The people appeal. Affirmed.

---

REFERENCE FOR POINTS IN HEADNOTE
47 Am Jur, Searches and Seizures § 71.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, and *Luvenia D. Dockett,* Assistant Prosecuting Attorney, for the people.

*Sheldon Otis,* for defendant on appeal.

KELLY, J.   At about 7 o'clock a.m., on December 30, 1964, Charles Johnson entered his garage, located behind his home in the city of Detroit, and was shot as he approached his automobile.

Defendant was charged with Johnson's murder. A jury found him guilty and he was sentenced to life imprisonment.

The Court of Appeals[1] found that the trial court erred in admitting into evidence a .22-caliber shell casing that Detroit policemen testified they found in defendant's car, and remanded the case for new trial.

Plaintiff presents one question:

"Where there was substantial evidence to support the trial court's finding that defendant consented to a search of his automobile, was it error for the Court of Appeals to substitute its judgment and reverse the decision of the trial court?"

The test we shall apply is not whether "there was substantial evidence to support the trial court's finding", but whether after we "indulge every reasonable presumption against waiver"[2] we find that the waiver or consent has been "proved by clear and positive testimony".[3]

---

[1] *People v. Shaw* (1968), 9 Mich App 558. Leave to appeal granted (1968), 381 Mich 769.

[2] *Johnson v. Zerbst* (1938), 304 US 458, 464 (58 S Ct 1019, 1023, 82 L Ed 1461, 1466).

[3] *People v. Kaigler* (1962), 368 Mich 281, 294.

The only witness who testified that defendant gave his consent to search his car was Robert Fullerton, a member of the Detroit police department, assigned to the homicide bureau, and who was assigned to the case immediately after the shooting was reported to the bureau.

Detective Fullerton testified that while conducting his investigation at the scene of the murder, he examined the garage and "observed what appeared to be a bullet hole on the north wall, found a .22-caliber spent shell [exhibit 7] on the floor among the debris".

Pursuant to Detective Fullerton's request, defendant was arrested by Pontiac police about 4 p.m. that same day (December 30, 1964) as he reported for work at a Pontiac factory, and Detective Fullerton drove defendant from Pontiac to Detroit that evening.

Detective Fullerton testified before the court (in the absence of the jury) that he advised defendant of his constitutional rights and, after stating: "My conversation with the defendant started at 10:30 p.m., on December 30, 1964, in room 432 of Police Headquarters. The defendant was questioned by myself and Detective James Haines", he read from a pad on which purported to be 52 questions that were asked defendant and 52 answers given by defendant.

Detective Fullerton testified that prior to taking the statement defendant Shaw gave his place of birth in Mississippi; his residence in Detroit; his ownership of an automobile, and the number of the license plate. The 52 questions referred to how and where he had spent the time between leaving his home at 5 p.m. the day before the shooting and his arrest at 4 p.m. the following day, and details of his previous acquaintance with Mr. and Mrs. Johnson.

All of the questions and answers were as complete in form as if recorded by a stenographer and, to illustrate this point, we quote questions 7 and 8:

"*Q.* Did you go to work then?

"*A.* No, I didn't go to work last night at all.

"*Q.* Where did you go?

"*A.* I drove to M–24 on Franklin Road, and the car stopped again. After a while I got it started again and decided not to go in to work. I drove back to Joy Road and Livernois, and I went into a liquor store on Joy Road and Grand River, the southeast corner, I believe. I called the shop from there and I told them I would be in around 9:30 p.m. I talked to Mr. J. Norman."

Plaintiff's claim that "there was substantial evidence to support the trial court's finding that defendant consented to a search of his automobile," is confined to the following answer to one of Detective Fullerton's 52 questions (question 38):

"*Q.* Do you have any objections if our laboratory men look over your car?

"*A.* None at all. None whatsoever."

On cross-examination, Detective Fullerton testified:

"*Q.* Where was Mr. Shaw's car when you were supposed to have found the shell in his car?

"*A.* In police headquarters garage, sir.

"*Q.* How did it get there?

"*A.* Police brought it from his home at 1235 Burlingame to police headquarters.

"*Q.* Did you have a warrant to go get it?

"*A.* No. sir.

"*Q.* Did you tell Mr. Shaw you were going out to get it?

"*A.* Yes, sir.

"*Q.* Do you have the keys from Mr. Shaw?

"*A.* No, sir.

"*Q.* How did you get it?

"*A.* Went to his home, talked to his wife—the officers did. I personally did not get it, sir.

"*Q.* You didn't get it. Whose car was it?

"*A.* Mr. Shaw's.

"*Q.* You didn't have that in writing, did you, any consent. You said you had a consent from Mr. Shaw to search through his car.

"*A.* When I spoke to him and wrote down our questions and answers, I asked him, and he consented.

"*Q.* As a matter of fact, you talked to Mr. Shaw all the way back from Pontiac, didn't you, in the car?

"*A.* We spoke, yes.

"*Q.* Talked to him.

"*A.* We had a conversation, yes, sir.

"*Q.* You didn't have any reporter present either, did you?

"*A.* No, sir.

"*Q.* You wrote those down, and you wrote the answers down?

"*A.* Yes, sir.

"*Q.* Right. You didn't show them to Mr. Shaw—

"*A.* Yes, sir.

"*Q.* —and see—Well, did you say, 'Mr. Shaw, initial this, Mr. Shaw, initial this'?

"*A.* Yes, sir.

"*Q.* You did that?

"*A.* Yes, sir.

"*Q.* Would you mind showing me that?

"*A.* He did not initial anything, nor sign anything.

"*Q.* Oh. He didn't do that, but yet you claim you showed it to him.

"*A.* Yes, sir.

"*Q.* And we have no way of knowing that, other than you say so.

"*A.* That's correct.

"*Q.* No reporter—There are reporters available that you could have brought in, aren't there?

"*A.* Yes, sir.

"*Q*. No reporter. You say so.

"*A*. Right.

"*Q*. And he's supposed to have given you consent to go out and get his car.

"*A*. To search his car.

"*Q*. To search his car.

"*A*. Yes, sir.

"*Q*. And that was not in writing, he told you; is that it?

"*A*. He told me we could.

"*Q*. He told you you could?

"*A*. He told me our laboratory men could search his car.

"*Q*. So you went out and got the car.

"*A*. Yes, sir.

"*Q*. And you are saying you got that on the basis of something he told you. When did he tell you that?

"*A*. During our interview that night.

"*Q*. When did you pick the car up?

"*A*. The next morning—or later that night. About midnight that night, I guess.

"*Q*. From in front of his house?

"*A*. Yes. It was during that same night."

None of the 52 questions referred to the location of defendant's automobile at the time of the questioning, nor did they give any indication of police desire or intention to seize or impound the car.

On direct examination, defendant testified:

"*Q*. Did you ever give him permission to go in your car?

"*A*. No, I did not.

"*Q*. Was there ever any conversation about it?

"*A*. No, there wasn't. There was none at all."

On cross-examination, defendant testified:

"*Q*. Did Officer Fullerton ask you if it was all right for the laboratory men to check your car?

"*A*. I had no choice. They had taken it already, and he did not.

"*Q.* No, wait a minute. Did he ask you?
"*A.* No, he did not.
"*Q.* Did you tell him you had no objection?
"*A.* I didn't tell him anything like that."

For reasons not explained in the record, the people did not offer any testimony of Detective Haines, who took part in the questioning of defendant, as to whether or not defendant gave his consent to the search.

In its decision, the Court of Appeals calls attention that (pp 560, 561):

"Over an objection by defense counsel, the trial court admitted into evidence a shell casing [Exhibit 9] and a live .22-caliber bullet found in defendant's automobile on December 31, 1964, about 18 hours after defendant was arrested in Pontiac. A police laboratory officer later testified that a comparison-microscope examination showed the markings on this casing and the one found at the scene of the crime to be identical; the officer further stated that identical markings are caused by firing both bullets from the same gun. The murder weapon itself was never found. It is therefore clear that the conviction cannot stand if it was error to admit into evidence the shell casing found in defendant's car."

Detective Fullerton's testimony also discloses conflict in regard to the seizure of defendant's automobile by the police, and the subsequent search.

Because of this fact, and because of plaintiff's confinement of proof of consent solely to Fullerton's testimony when additional testimony was available to support either the defendant's disclaimer of consent or Detective Fullerton's testimony that defendant gave consent, we do not feel justified in granting plaintiff's request "that the decision of the Court of Appeals vacating the conviction and remanding

this cause for a new trial be reversed and that judgment of the trial court be affirmed."

Court of Appeals affirmed. Remanded for new trial.

T. E. BRENNAN, C. J., and DETHMERS, BLACK, T. M. KAVANAGH, and ADAMS, JJ., concurred with KELLY, J.

T. G. KAVANAGH, J., did not sit in this case.