PEOPLE v MOSS

PEOPLE v TILLEY

Opinion of the Court

1. Homicide—Manslaughter—Proximate Causation—Independent Intervening Cause—Instructions to Jury—Jury Determination.

The determination of proximate causation or of the existence of an independent intervening cause is one to be made by a properly instructed jury; therefore where the jury was properly instructed on these concepts and there is evidence whereby the jury could reasonably conclude that one defendant disarmed the deceased police officer and played a major part in restraining the officer while a second defendant obtained the officer's weapon which the second defendant then, almost immediately, used to kill the police officer, it was reasonable for the jury to determine that the action of the first defendant was the proximate cause of the killing and that the actual killing by the second defendant was not an independent intervening cause.

Partial Concurrence by M. J. Kelly, J.

2. Criminal Law—Prosecutor's Opening Statements—Improper Issues—Fair View of Evidence.

It is improper for a prosecutor to inject issues broader than the guilt or innocence of a defendant, however, it is proper to predicate argument on a fair view of the evidence; therefore it was not error for a prosecutor, in his opening statement to the jury, to refer to the killing involved in the case as the result of the brutality and inhumanity of the defendants where a review

References for Points in Headnotes

[1, 6, 7] 40 Am Jur 2d, Homicide §§ 17, 506.
[2] 63 Am Jur 2d, Prosecuting Attorneys § 27.
[3] 63 Am Jur 2d, Prosecuting Attorneys §§ 1, 26.
[4] 63 Am Jur 2d, Prosecuting Attorneys §§ 17, 27.
[5] 30 Am Jur 2d, Evidence § 1172.

of the record shows that, when viewed in a light favorable to the prosecution, there was ample proof that the defendants did in fact behave in a brutal and inhuman manner.

3. CRIMINAL LAW—IMPROPER QUESTIONING—GOOD FAITH—ADMISSIBILITY OF SUBJECT MATTER—APPEAL AND ERROR.

The very process of asking improper questions may fatally infect a trial; however, if the questions are asked in good faith there should be no reversible error and, conversely, if the approach cannot be ascribed to a bona fide belief in the admissibility of the subject matter the Court of Appeals will carefully consider a claim of prejudice; therefore, where a prosecutor refrained from further inquiry in a certain area when the court questioned the wisdom of the objected-to cross-examination and the Court of Appeals finds that the line of inquiry could have some tendency to prove matters properly a part of the case, there is no error.

4. CRIMINAL LAW—APPEAL AND ERROR—JUDICIAL MISCONDUCT—DUTY TO CONTROL PROCEEDINGS—FAIR AND IMPARTIAL TRIAL—STATUTES.

Defendants' claim that the trial court improperly interrupted and criticized defense counsel in a manner which deprived the defendants of a fair trial must be considered in the context of the court's duty to control the proceedings; the dispositive question is whether the court's participation in the trial denied the defendants a fair and impartial trial by unduly influencing the jury and a few arguably intemperate comments by the court and a forceful curative instruction, when viewed in the context of a lengthy trial, did not deprive the defendants of a fair trial (MCLA 768.29; MSA 28.1052).

5. CRIMINAL LAW—APPEAL AND ERROR—BURDEN OF PROOF—ELEMENTS OF CRIME—SUFFICIENCY OF EVIDENCE—FUNCTION OF JURY—STANDARD OF REVIEW.

The burden in a criminal trial is on the prosecution to prove the defendant's guilt beyond a reasonable doubt on every element of the crime charged and an appellate court, in reviewing a convicted defendant's claim of insufficient evidence, must remember that it is the jury's function, as sole judge of the facts, to listen to testimony, weigh the evidence and decide the questions of fact; therefore where sufficient evidence exists, which may be believed by the jury, to sustain a verdict of guilty beyond a reasonable doubt, the decision of the jury should not be disturbed by an appellate court.

6. Homicide—Premeditation—Direct Evidence—Inferences—Defendant's Conduct—Basis in Record—Appeal and Error.

Premeditation, being a state of mind, need not be established by direct evidence but may be inferred by a defendant's conduct in light of the circumstances; however, such an inference must have an adequate basis in record evidence and where there is an adequate evidentiary basis for the jury's finding of premeditation in a homicide, the jury's determination will not be disturbed on appeal.

7. Homicide—Manslaughter—Independent Intervening Cause—Proximate Cause—Resisting Arrest.

*A defendant is not guilty of manslaughter where his acts only create a situation which provides the opportunity for a killing by other independent means; therefore, where the defendant only struggled with a police officer in resisting arrest and a third person picked up the officer's gun and killed the officer, the intervention of the third person was an independent intervening cause of death which broke the causal chain between the acts of the defendant and the eventual death of the officer; the prosecution is required to prove that the defendant's acts were* the *proximate cause of the killing and not just a proximate cause.*

Appeal from Wayne, James N. Canham, J. Submitted November 6, 1975, at Detroit. (Docket Nos. 19796, 20315.) Decided July 19, 1976. Leave to appeal applied for.

David A. Moss was convicted of manslaughter and Dennis E. Tilley was convicted of first-degree murder. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Patricia J. Boyle,* Principal Attorney, Research, Training & Appeals, and *Ronald P. Weitzman,* Assistant Prosecuting Attorney, for the people.

*Burdick & Fink,* for defendants.

Before: D. E. HOLBROOK, P. J., and J. H. GILLIS and M. J. KELLY, JJ.

D. E. HOLBROOK, P. J. This opinion is written after Judge KELLY wrote his opinion affirming the conviction of Dennis Edwin Tilley for first-degree murder, and reversing the conviction of David Allen Moss for manslaughter. These cases had previously been consolidated for hearing on appeal.

We agree with Judge KELLY in his opinion as to defendant Tilley, affirming the conviction. We are constrained to write this opinion for affirmance of the conviction of defendant Moss.

We are convinced that the evidence was sufficient for the jury to find defendant Moss guilty of manslaughter. The court below gave the following jury instructions regarding "independent intervening cause":

"The People allege that the decedent's death was brought about because of an unlawful act, resisting arrest and assault and battery by defendant Moss.

"With regard to the unlawful act, there must be such a relation between the commission of the unlawful act and the killing that it logically follows that the killing occurred as a part of the preparation of, or attempt to commit the unlawful act. The death must be due to the unlawful act of the accused and not due to the intervening act or negligence of a third person, which was unforeseeable, or to an independent intervening cause in which the accused did not participate and which he could not foresee; and the death must have been the natural and probable consequence of the unlawful act, and the act the proximate cause of the death.

"If you find that the defendant Moss is guilty of resisting arrest or assault and battery, you also find that the killing was the direct and proximate result of the commission of an unlawful act, you will find defendant Moss guilty of manslaughter. However, if you find

that defendant Moss was not guilty of either resisting arrest or assault and battery, or if you find that the killing was not the direct and proximate cause of the commission of either of these acts or if the killing resulted from the intervening act of a third person or some independent intervening cause, then you must find defendant Moss not guilty of manslaughter."

Apparently the jury felt that the unlawful acts of defendant Moss were the proximate cause of the death of the two victims in this case, and that the acts of defendant Tilley did not constitute an independent intervening cause, for the jury found defendant Moss guilty as charged. Of course, the determination of proximate causation or of the existence of an independent intervening cause is one to be answered by a properly instructed jury. See, *e.g., People v Flenon,* 42 Mich App 457; 202 NW2d 471 (1972), *lv den* 388 Mich 801 (1972). Nevertheless, the opinion for reversal concludes that defendant Tilley's intervention was an independent intervening cause of death and that the acts of defendant Moss were not the proximate cause of the deaths in question. The opinion for reversal states: "In the instant case, the evidence does not show that defendant's behavior in fighting with Officer Mickel and resisting arrest directly caused death." Thus, it becomes obvious that the opinion for reversal takes a view of the facts in evidence in this case which is in opposition to that taken by the jury which convicted defendant Moss. It is stated at p 3 of the opinion for reversal: "It is a fair inference that Moss fled during the shooting." It is respectfully submitted that the transcript in this case contradicts the quoted statement from the opinion for reversal, and that it would be an unfair inference to conclude that defendant Moss was fleeing during the

shooting. It is true that many of the witnesses
stated that they did not know where defendant
Moss was at the precise instant the shots were
being fired. But this was generally explained by
the witnesses as a result of the fact that they were
watching the shooting itself, and not looking for
defendant Moss. However, the following testimony
was given at trial:

*"Q. [Mr. Boak, assistant prosecutor]:* Who was fight-
ing at that time?
*"A. [Mr. Staake, witness]:* All three.
*"Q.* All three people?
*"A.* Right.
*"Q.* The man who had been holding the gun?
*"A.* Right.
*"Q.* And the two defendants?
*"A.* Right.
*"Q.* Where were they at that time?
*"A.* They were right in the parking lot, right there,
right outside the window.
*"Q.* Were they standing or were they on the ground?
*"A.* They were standing.
*"Q.* Where was the gun at that time, if you know?
*"A.* I didn't see the gun.
*"Q.* What happened after that?
*"A.* Well, after that it was just so quick. I seen the
gun fell *[sic]* two or three times, as far as I know.
*"Q.* Did you see who picked it up on those occasions?
*"A.* Right, I can't be sure, but if I remember cor-
rectly, Moss picked it up once and didn't use it, and
then it was just more shuffling. Then it fell again, and I
think the policeman held the gun and I think it drop-
ped from him and then the other fellow picked it up.
*"Q.* Mr. Tilley?
*"A.* Right.
*"Q.* What happened then?
*"A.* Well, there was about maybe three seconds, four
seconds and then he just started firing.

"*Q*. In what direction was he firing?

"*A*. At the policeman.

"*Q*. The other person that was out there?

"*A*. Right.

"*Q*. Where was he in relation to Mr. Tilley, the man who was firing the gun, how far away?

"*A*. It couldn't have been more than three feet, three, four feet.

"*Q*. Was he facing him?

"*A*. Yes.

"*Q*. What was the person who did not have the gun doing at that time?

"*A*. Which one is that?

"*Q*. The person who did not have the gun.

"*A*. There was two.

"*Q*. Did you see Mr. Moss?

"*A*. Yes.

"*Q*. What was he doing?

"*A*. Well, he was there, but I don't know. I guess he was just standing there."

It is apparent from the above-quoted testimony that the witness saw defendant Moss after defendant Tilley had obtained the deceased deputy's gun.

"*Q*. *[Mr. Ritchie, for defendant Tilley]:* Thank you. All right. You remember the men were struggling. The weapon was dropped on several occasions as you described and then what happened?

"*A*. *[Mr. Staake]:* Well, the party Tilley picked up the gun when it was dropped and pointed it for three seconds or so and then began shooting at the officer.

\* \* \*

"*Q*. *[Mr. Wisok, for defendant Moss]:* Now, where were these people, the other people, when you say Mr. Tilley pointed the gun at the decedent?

"*A*. *[Mr. Staake]:* I think they were still on him."

The jury could have certainly found from the above testimony that defendant Moss did some-

thing more than simply disarm the officer and flee the scene. Another witness testified as to the events which occurred when one of the bouncers in the restaurant approached the deceased officer who had placed defendant Moss in a spread eagle position against a car in the parking lot:

"*A. [Miss Primm, witness]:* The man said, 'I do not believe you're a policeman.'

"*Q. [Mr. Boak]:* What happened then?

"*A.* Mr. Mickel pulled in his wallet back here and he took out and he showed the man his I.D. He said, 'Will you please call the police?' And the guy walked back inside.

"*Q.* What happened after the man walked back inside?

"*A.* Then Moss started to get away. He started pushing, you now, *[sic]* trying to get away and that, and he started to get away.

"Well, before he did start to get away, Tilley was standing behind the police officer, Mr. Mickel, and he started to say, 'Shoot me, cop, shoot me, kill me. Put the gun on me.'

"And Mr. Mickel said, 'Just go away. Your're not under arrest. Just leave.'

"And he kept saying this and saying this and Mickel kept looking back. This is when Moss started to get away and they started fighting.

"*Q.* Who started fighting?

"*A.* Mr. Mickel and Mr. Moss. Then Mr. Mickel hit Mr. Moss on the head back here a couple of times trying to stop him.

"*Q.* What was Mr. Moss doing at that time when he got hit?

"*A.* He was still fighting.

"*Q.* Where was Mr. Tilley?

"*A.* He was still standing where he was. Then they came like near Mr. Tilley, and then Mr. Tilley started getting into it.

"*Q.* What happened at that point?

"*A.* The next thing I seen, I seen Mr. Tilley have the gun, waving it up in the air.

"*Q.* Your're indicating. Is your finger sort of the barrel of the gun?

"*A.* Right. It was like this.

"*Q.* He was waving it up in the air?

"*A.* Right.

"*Q.* What happened then?

"*A. Then they took the police officer and put him spread-eagle against the car. That was right in front of the door of the restaurant, the entrance going into the restaurant.*

"*Q.* What happened then?

"*A. Well, they had him there, both of them were holding him. Tilley was on the this* [sic] *side and Mr. Moss was on this side.* He started to get away. And I seen Mr. Tilley and Mr. Mickel by the door, the entrance to the Nugget. I seen them starting to go by there because Mr. Mickel started getting away from him, *from both of them,* and I seen backfires of a gun. I heard shots three times.

\* \* \*

"*A.* Well, he still kept, he started fighting. He turned around and he got so he was fighting with the police officer again. This is when they, they started fighting around there. This is when Tilley got in there and started fighting with them. Then the next thing, they were like, I seen them on the ground. *The next thing I knew Tilley was waving the gun.*

"*Q. [Mr. Ritchie]: Where was* [sic] *the others when he was doing this?*

"*A. Moss had Mr. Mickel, he was holding onto him.*

\* \* \*

"*Q.* Then Mr. Tilley got the gun and what happened?

"*A.* Then Moss, Mr. Moss and Mr. Tilley had, they still had Mr. Mickel. They were holding him. They dragged him over and pulled him over to the car. The car that would be right there in front of the restaurant, right where the entrance door is like, right at it.

"*Q.* Then, what happened?

"*A.* Then they had Mr. Mickel spread eagle against the car.

"*Q.* Who dragged the officer over to the car?

"*A.* They both had the officer.

"*Q.* Who?

"*A.* Well—Mr. Moss really had the hold onto the officer. Tilley had the gun. He was just, you know, waving it around." (Emphasis supplied.)

It is apparent from the foregoing quoted testimony that a properly instructed jury could certainly have found that defendant Moss played a major part in the events following the securing of the gun by defendant Tilley. We believe the testimony was sufficient to show that defendant Moss not only disarmed the deceased officer, but played a major part in restraining him while defendant Tilley obtained the officer's weapon. We believe that a jury could have concluded that defendant Moss intended to do so. Certainly, once he had done so, it cannot be seriously argued that it was unforeseeable that defendant Tilley would use the weapon so obtained from the deceased officer. The *Flenon* case, *supra,* cited by the opinion for reversal, affirmed a conviction of first-degree murder of a defendant who shot the deceased in the leg. The deceased was rushed to a hospital where his leg was amputated. Five weeks later the deceased was released and returned home only to die a short time later of serum hepatitis and pneumonia. The Court held that the victim's death due to serum hepatitis was within the realm of foreseeability. Certainly the shooting of a police officer with the officer's own gun by a codefendant is just as foreseeable to a defendant who not only disarmed the officer, but restrained the officer in his attempt to regain possession of the weapon, and who assisted the codefendant in restraining the officer even

after the codefendant had gained possession of the weapon.

There appears to be no meaningful distinction between the instant case and *People v Arnett,* 239 Mich 123; 214 NW 231 (1927). There being no meaningful distinction, there is no reason why the result should differ. Defendant Moss's conviction should therefore be affirmed.

Affirmed.

J. H. Gillis, J., concurred.

M. J. Kelly, J. *(concurring in part, dissenting in part).* These convictions are the result of an affray at a restaurant in Southgate shortly after 2:30 a.m. on November 18, 1973. Paul Mickel and Ilene Bowdle died of gunshot wounds. Defendant Tilley was convicted of first-degree (premeditated) murder, MCLA 750.316; MSA 28.548, and was sentenced to imprisonment for life. Defendant Moss was convicted of manslaughter, MCLA 750.321; MSA 28.553, and was sentenced to a prison term of 10 to 15 years. Both defendants appeal.

The restaurant was crowded at the time. Many patrons saw some portion of the chain of events. There are variations in the versions of the eyewitnesses. Defendant Moss arrived at the restaurant and told a bouncer that he was in a mean mood. His conversation in content and tone indicated he was spoiling for a fight. His friend, defendant Tilley, arrived a short time later. Moss approached Paul Mickel who was seated in a rear booth with friends. Moss, the aggressor, grabbed Mickel from the rear and said something like "step outside". Mickel and Moss walked out of the restaurant through the vestibule and to a parking area outside. Tilley followed, but his interest at that time was that of a spectator. Mickel was an off-duty Wayne County Sheriff's deputy. Those in

the restaurant looked out the windows for a view
of the expected fight. A second bouncer went to
the front door to prevent people in the restaurant
from going outside to expand the altercation.

Once outside, Moss and Mickel exchanged
heated words. Moss reached into his pocket and
pulled a derringer. Mickel disarmed Moss and
pulled his own pistol, identified himself as a sher-
iff's deputy, and placed Moss against a nearby car
in a spread eagle fashion. Spectators, apparently
believing Mickel the aggressor, demanded that he
identify himself. Mickel flashed his badge and
asked the second bouncer to call the local police.

Tilley then began taunting the officer with com-
ments such as "shoot me, pig, shoot me, kill me.
Put the gun on me". Mickel told Tilley to leave;
that he was not under arrest and that the affair
was none of his business. The officer's attention
having been distracted by Tilley, Moss whirled and
grabbed for the pistol. Mickel struck him with his
gun hand. The gun fell to the ground and the
three men scrambled for it. Tilley came up with it.

At this juncture the single unequivocal fact is
that Tilley began firing and Mickel was struck.
Some witnesses suggest that Mickel had begun
retreating toward the restaurant while others indi-
cate that he was still on the ground. According to
most witnesses there were two volleys. Mickel,
having been wounded in the first volley, retreated
toward the vestibule of the restaurant while Til-
ley, following, fired more shots. The consensus is
that three shots were fired, there was a pause and
three more were fired. Estimates of the time peri-
ods involved varied greatly. This much is clear;
five of the shots found their mark. The sixth
struck and killed Ilene Bowdle, a bystander who
was attempting to enter the restaurant.

It is a fair inference that Moss fled during the shooting. Most of the witnesses did not recall seeing him after Tilley came up with the officer's pistol. Various portions of the events were seen by about 20 eyewitnesses. The majority opinion on this issue quotes two. The first witness says: "I guess he was just standing there." "I think they were still on him." The second quoted witness, Ms. Primm, gave testimony which was suspect and contradictory. We will not engage in a quoting contest but the only fair assessment of all the testimony from the record shows that Moss had ceased participation after Tilley gained control of the gun. If Moss ever touched the gun his prints were obliterated because they were not found on the weapon.

After the shooting Tilley also fled, throwing the gun in the air. He ran to his car which was parked nearby. As he pulled on to the road, he struck another car. Without stopping, he drove away. Within two hours of the incident the defendants separately surrendered themselves at the police station.

The original charge was first-degree murder against both defendants; Tilley on a premeditated basis and Moss on an aiding and abetting[1] rationale. Both were bound over following examination on the first-degree murder charge. Moss brought a motion to quash the information in circuit court which was granted on the theory that there was insufficient evidence produced at the examination to support the aiding and abetting theory. This ruling was never made the subject of an appeal and is not before us now.

The people then proceeded against Moss on a misdemeanor-manslaughter theory. It was charged

---

[1] MCLA 767.39; MSA 28.979.

that he was guilty of assault and battery[2] and resisting arrest[3] and that these acts directly and proximately caused the deaths of Mickel and Bowdle. The amended information charged that Moss "did, without malice and unintentionally, kill Paul Mickel and Ilene Bowdle by engaging in an unlawful act, to-wit: resisting a lawful arrest and/or assault and battery; said unlawful act(s) not amounting to a felony nor naturally tending to cause death or great bodily harm".

The thrust of the defense presented by Moss to the jury was that his acts were not the proximate cause of death. Tilley argued to the jury that he shot in the belief that Mickel was the aggressor. Tilley claimed that he was provoked into shooting Mickel to protect Moss.

Both defendants were found guilty on two counts. The parties are in agreement that the legal principles governing disposition of the Mickel killing will also govern disposition of the Bowdle killing. For this reason, our opinion will not deal specifically with the Bowdle case.

## I

### PROSECUTORIAL MISCONDUCT

It is claimed on behalf of defendant Tilley that the prosecuting attorney injected error in his opening statement. The allegation is that his comments were unduly inflammatory and served to deny defendants a fair trial. The prosecutor told the jurors:

"Now, the events which you are about to hear if they were in literature or in some form of the arts would be

---

[2] MCLA 750.81; MSA 28.276.
[3] MCLA 750.479; MSA 28.747.

denoted a tragedy. In this particular case it is a tragedy engineered by the brutality and inhumanity of two men, the defendants in this case. You will see from the evidence that we have that we know and have heard about, perhaps had personal contact with what we would call the 'neighborhood bully'. We have two of them in this case. Two bullies who carried their actions to ultimate disaster towards two persons, two innocent persons."

The evidence in the case is what divides proper prosecutorial argument from improper comments. It is improper for the prosecutor to inject issues broader than guilt or innocence. *People v Farrar,* 36 Mich App 294, 299; 193 NW2d 363 (1971). It is proper to predicate argument on a fair view of the evidence. *People v Couch,* 49 Mich App 69; 211 NW2d 250 (1973), *lv den,* 391 Mich 755 (1973).

"Of course, a prosecutor must avoid inflaming the prejudices of a jury, but there is no requirement that he phrase his argument in the blandest of all possible terms. The prosecutor is, after all, an advocate and he has not only the right but the duty to vigorously argue the people's case." *People v Cowell,* 44 Mich App 623, 628–629; 205 NW2d 600 (1973).

In the cited cases, these principles deal with closing arguments. We think they apply equally to opening statements. The purpose of an opening statement is to tell the jury what the advocate proposes to show. A review of this record shows that, when viewed in a light favorable to the prosecution, there was ample proof that the defendants did in fact behave in a brutal and inhuman manner. It is our opinion that the comments in issue are a fair introduction to the evidence. See *People v Davis,* 57 Mich App 505; 226 NW2d 540 (1975), *lv den,* 394 Mich 817 (1975), where the

prosecutor referred to the defendant as a "brutal killer".

Defendant Tilley next claims prejudicial prosecutorial questions which improperly suggested guilt of prior unrelated acts of violence. Error is charged in the following exchange:

"Q. *[Mr. Boak]:* Did you ever have occasion to use your physical strength along with the co-defendant David Moss?

"*Mr. Wisok:* I will object to that question, your Honor. I think it is highly irrelevant and immaterial. It certainly doesn't follow his line of questioning.

"*The Court:* Let me have that question one more time again, please.

"*Mr. Boak:* Did you ever use your physical strength along with David Moss?

"*The Court:* What do you mean by that?

"*Mr. Boak:* Well, has David Moss ever helped him out as a bouncer, has David—he and David Moss ever been in any other altercations prior to this night.

"*The Court:* That may be a problem right there. The question is, right now, did you ever—if you want to ask him if he ever sat down and lifted weights together, I suggest, fine; but I don't really know how he can answer that question, 'Have you ever used your physical—.'

"*Mr. Boak:* Strength.

"*The Court:* '—strength with, in conjunction with Moss?'

"*Mr. Boak:* Right.

"*The Court:* It confuses me. I don't know exactly what you are looking for. Therefore, I will ask you to rephrase it, counsel.

"*Mr. Boak:* All right.

"Q. *[By Mr. Boak]:* Put it simply, sir: Have you ever had occasion to come to the aid of Mr. Moss before this night?

"*Mr. Ritchie:* I object to that question, your Honor.

"*The Court:* Well, what we may be getting into there,

counsel, is incriminating. It may be incriminating and I just want to avoid that. I don't know about other people in this lawsuit.

"*Mr. Boak:* It may be incriminating, certainly, your Honor. But he is under cross-examination.

"*The Court:* Come here, come here. You don't understand my problem."

(A brief conference was had at the side bar between court and all counsel.)

After that the subject was dropped. The question was not answered. The people say that since Tilley did not answer any questions no prejudice could be claimed. This is not correct. It has been held that the very process of asking improper questions may fatally infect a trial. See *People v Di Paolo,* 366 Mich 394; 115 NW2d 78 (1962), and *People v Brocato,* 17 Mich App 277; 169 NW2d 483 (1969). If the questions were asked in good faith there should be no reversible error. Conversely, if the approach cannot be ascribed to a bona fide belief in the admissibility of the subject matter we will carefully consider a claim of prejudice. See *People v Taylor,* 44 Mich App 640, 648; 205 NW2d 884 (1973), *lv den,* 391 Mich 758 (1974).

Applying these principles to the case at bar, it is evident that there was no reversible error. The prosecutor refrained from further inquiry in this area when the court questioned the wisdom of the cross-examination. Compare the repeated misconduct found in *People v Brocato, supra.*

As to the reference to weight-lifting practices, we surmise that the prosecutor sought to portray Tilley, a former bouncer, as a powerful individual who could rely on his own strength; therefore, his use of a deadly weapon was not premised on a reasonable belief that it was necessary to shoot Mickel to subdue him.

Similarly, we find the questions regarding opportunities Tilley may have had to use his strength with Moss to be understandable. The prosecutor argues that Tilley may have begun reflecting while Mickel held Moss at bay. If Moss and Tilley had fought together in the past, each could have been anticipating a repeat performance. We find the line of inquiry could have some tendency to prove matters properly part of the case. There being a modicum of probative value, the task of weighing that probative value against the attendant prejudice to the defendants is a matter for the trial court's discretion. *People v Shaw,* 9 Mich App 558, 566; 157 NW2d 811 (1968), *affirmed,* 383 Mich 69; 173 NW2d 217 (1970). Since the prosecutorial conduct is consistent with a good faith belief that the line of inquiry would be deemed admissible, we find no error.

## II

### JUDICIAL MISCONDUCT

Defendants next say that the trial court improperly interrupted and criticized defense counsel in a manner which deprived defendants of a fair trial. This claim must be considered in the context of the court's duty to control the proceedings.[4] For example, on one occasion, the trial court chastised defense counsel for referring to this litigation as a "capital offense" during the cross-examination of a

---

[4] This duty is codified as MCLA 768.29; MSA 28.1052, which states in part:

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

witness. Counsel's comment was improper[5] for at least three reasons. First, the comment was testimonial in nature and hence outside counsel's role in the trial. Second, the characterization was false, there being no capital punishment in the state. Const 1963, art 4, § 46. Third, the comment was an implied invitation to the jurors to consider punishment. The assessment of punishment is a question of law and exclusively within the province of the court. *People v Cole,* 382 Mich 695, 718; 172 NW2d 354 (1969). The ruling which followed may have been unnecessarily forceful; it was however correct in fact and in law. Counsel recognized his slip of the tongue and thrice apologized.

Another colloquy occurred following this objection: "Under what guise is defense counsel doing this?" It was prompted when defense counsel referred a witness to his testimony at the preliminary examination. Presumably the prosecutor was requesting that counsel disclose whether he intended to use the examination transcript as a prior inconsistent statement or to refresh the memory of the witness. See generally *Hileman v Indreica,* 385 Mich 1; 187 NW2d 411 (1971). We do not believe that defendants were prejudiced by the use of the term "guise".

Again, the ruling on the objection was forceful but not erroneous:

"*Mr. Wisok:* I want to refresh his recollection as to what happened there.

"*The Court:* He doesn't necessarily have to be refreshed. You may think so, but he hasn't said he needed having his recollection refreshed.

---

[5] We do not suggest that there was any deliberate misconduct. We ascribe counsel's error to the stress of trial. In fact, the professional and courteous manner in which this case was tried distinguishes it from *People v Watson,* 52 Mich App 211; 217 NW2d 121 (1974), and *People v McIntosh,* 62 Mich App 422; 234 NW2d 157 (1975).

*"Mr. Wisok:* This is proper cross examination.

*"The Court:* I just ruled it isn't. That's all it takes. He doesn't say it needs refreshing. There's nothing proper about that kind of question.

*"Mr. Wisok:* Your Honor—

*"The Court:* Get this straight right now in this trial: When I make a ruling, it's a ruling.

*"Mr. Wisok:* I'm sorry, your Honor.

*"The Court:* Don't be sorry, just don't do it again. Thank you.

*"Mr. Wisok:* Very well, thank you."

Prerequisite to the use of a memorandum to refresh the recollection of a witness is the necessity to resort to it. *Battle Creek Food Co v Kirkland,* 298 Mich 515, 527; 299 NW 167 (1941). Even under the more liberal rule found in McCormick on Evidence, § 9, p 18, the matter is discretionary.

Another claim of error stems from the court's comments in refusing to admit a statement made by witness Susan Primm to the police. The propriety of that evidentiary ruling will be discussed later. For the present, we will consider only the tenor of the court's comments:

*"Mr. Boak:* I would want to know the reason why it is being offered.

*"The Court:* Counsel: Why?

*"Mr. Wisok:* Because it indicates great discrepancies between that and her testimony.

*"The Court:* That is a conclusion on your part, counsel. Certainly that remark of counsel should be disregarded by the jury. That is his conclusion. That is his client. He would like to have you believe that about everything that has been offered. You are certainly to disregard the remark of counsel."

We find no error in the substance of the court's ruling. The further comment about what counsel

would like to have the jury believe was intemperate but not reversibly erroneous. Since the document was not in evidence, it was improper for counsel to characterize the contents. That there were "discrepancies" and that they were "great" are conclusions of counsel and not evidence.

On other occasions, the court allowed witnesses to fully explain their answers. These intrusions can be justified as an exercise of the court's obligation to protect the witnesses from undue embarrassment and harassment. Other judicial intervention constituted proper judicial attempts to shed light on matters unclear from the testimony. See *People v Watson,* 52 Mich App 211; 217 NW2d 121 (1974).

The sum and substance of defendants' claim is that the trial court was unduly abrasive in his criticism of counsel. We surmise that upon calm reflection some of the trial judge's rulings would have been tempered. Certain comments were sharper than necessary. That is not the test for reversal. The dispositive question is whether the court's participation in the trial denied the defendants a fair and impartial trial by unduly influencing the jury. *People v Young,* 364 Mich 554; 111 NW2d 870 (1961), *People v Cole,* 349 Mich 175; 84 NW2d 711 (1957). To so determine we review the record in its entirety and adopt the words of Judge Peterson in *People v McIntosh,* 62 Mich App 422, 438–439; 234 NW2d 157 (1975):

"A judge is no less human because he has become a judge. He is not devoid of opinion or emotional reaction to those about him or always correct in those opinions and reactions. He has, perhaps, more bad days than good ones, and nothing about the occupation shields him from the stress and distress of counsel and litigants in their most trying moments. He is conscious that he is

the one person involved whose presence, in itself,
should have a benign effect on the course of trial, and
that if he cannot fulfill that role, the end of an impar-
tial trial may be lost. Ideally he would always discretely
and circumspectly subordinate his opinions and emo-
tions so as to display courtesy and impartiality to
counsel and litigants notwithstanding their actions.

"It is not always possible; and it does not follow that
every deviation from the ideal requires a new trial. Few
verdicts would ever stand were that so. Rather, recog-
nizing both human fallibility and the stress of trial,
each case is to be reviewed in its entirety to determine
whether an atmosphere of prejudice has crept in which
may have deprived the appellant of a fair trial."

Here, the court gave a forceful instruction:

"Before I leave the reference to counsel, Ladies and
Gentlemen, please understand the role of the Court is
primarily an umpire, one who oversees the progress of
the litigation before the Court. The Court may seem at
times intemperate and may seem at times unduly crit-
ical. Please be ensured that the Court does not intend
this, more importantly that the Court does not wish to
infer it favors one side or the other by its rulings or
statements to counsel. I instruct you to disregard any
statement the Court has made to counsel. We don't
have the pleasure of sitting in a Court wherein you
may have six cases a term. We are a crowded court.
You know that since you have been here for the month.
Judges, lawyers as you and anyone else may become
unduly critical and intemperate. I ask for forgiveness
for that from counsel and the Jury. But I instruct you
to disregard it. It is not a part of the lawsuit nor is it a
part of the evidence.

"If you feel the Court has made by conduct any
reference or decision on the evidence, disregard that for
I will not invade your province nor is counsel allowed
to. You are the sole judges of the evidence. You are the
sole judges of the evidence, you and you alone. No one
shall invade that province."

The few arguably intemperate comments of the court, when viewed in the context of a lengthy trial, and a forceful curative instruction, did not deprive the defendants of a fair trial. *People v McIntosh, supra, People v Gray,* 57 Mich App 289; 225 NW2d 733 (1975).

## III

### *INCLUDED OFFENSES*

Defendant Moss argues that the trial court committed reversible error in refusing his request to charge on the lesser included offenses of assault and battery and resisting arrest. This trial took place before the Supreme Court decisions in *People v Chamblis,* 395 Mich 408; 236 NW2d 473 (1975), and *People v Ora Jones,* 395 Mich 379; 236 NW2d 461 (1975). It is unnecessary for us to address the issue of lesser included offenses in this opinion as we find reversal mandated as to Moss and the issue will not come up on retrial.

## IV

### *SUFFICIENCY OF THE EVIDENCE*

Both defendants argue that the trial court erred in denying the respective motions for directed verdicts of acquittal. Defendant Tilley claims insufficient evidence of premeditation; Defendant Moss claims that there was no evidence that his acts were the proximate cause of death.

In *People v Palmer,* 392 Mich 370, 375–376; 220 NW2d 393 (1974), the Court explained the function of an appellate court in reviewing a claim that there was insufficient evidence:

"In a criminal trial the burden is on the prosecution

to prove the defendant's guilt beyond a reasonable doubt on every element of the crime charged. On appeal from a conviction a defendant may request the appellate court to determine if the prosecution fulfilled this burden. In conducting this review the appellate court must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact. *People v Mosden,* 381 Mich 506, 510; 164 NW2d 26 (1969). In determining the facts the jury may draw reasonable inferences from the facts established by either direct or circumstantial evidence. *People v Weyonen,* 247 Mich 308, 311; 225 NW 552 (1929).

"Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony. Where sufficient evidence exists, which may be believed by the jury, to sustain a verdict of guilty beyond a reasonable doubt, the decision of the jury should not be disturbed by an appellate court. *People v Moore,* 306 Mich 29, 33; 10 NW2d 296 (1943).

"In a criminal case the reviewing court must examine the record to determine whether the evidence was ample to warrant a jury verdict of guilty beyond a reasonable doubt of the crime charged. *People v Williams,* 368 Mich 494, 501; 118 NW2d 391 (1962)."

### A (As to Tilley)

Premeditation, like other mental occurrences, is rarely amenable to direct proof. *People v Wolf,* 95 Mich 625; 55 NW 357 (1893), *People v Morrin,* 31 Mich App 301, 331; 187 NW2d 434 (1971). If there is direct evidence of events from which reasonable jurors could infer the existence of premeditation we must affirm.

"Premeditation and deliberation need not be established by direct evidence. The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances. Such an inference, however, must have adequate basis in record evidence." *People v*

*Hoffmeister,* 394 Mich 155, 158–159; 229 NW2d 305 (1975).

A frequently cited[6] amplification of the terms "premeditate" and "deliberate" is contained in *People v Morrin,* 31 Mich App 301, 329–330; 187 NW2d 434 (1971), *lv den,* 385 Mich 775 (1971):

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look'."

A clear summary of the applicable law is set forth in *People v Meier,* 47 Mich App 179, 191–192; 209 NW2d 311, 318 (1973), and cited with approval in *People v Vertin,* 56 Mich App 669; 224 NW2d 705 (1974):

"Our own answer to the question of the appropriate rule to follow as to what constitutes premeditation in a first-degree murder case is not a definition. Rather, it is a reaffirmation of the role of the trier of fact in deciding the degree of guilt of an accused under the following established principles:

"(1) Premeditation can be reasonably inferred from the circumstances surrounding the killing;

"(2) A defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or

---

[6] Portions of the very passage were cited with approval by our Supreme Court in *People v Vail,* 393 Mich 460, 468–469; 227 NW2d 535 (1975), and *People v Hoffmeister, supra,* 394 Mich at 159.

reflection, *i.e.,* one cannot instantaneously premeditate a murder;

"(3) A sufficient time lapse to provide an opportunity for a 'second look' may be merely seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing;

"(4) Where it is factually clear that there is *no* evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

"Attempting to further clarify this 'definition' in the past has, we believe, led to an invasion by the appellate courts into areas rightfully left to the trial court in its factfinding processes." (Emphasis in original.)

The requirement is that the prosecution prove that a sufficient time elapsed for the defendant to premeditate. Defendant urges there was insufficient evidence at the preliminary examination and again at trial to infer premeditation.

The critical testimony at the preliminary examination came from Mr. Ormanian:

"*A. [Mr. Ormanian, witness]* [After Tilley picked up the gun] Then Mr. Tilly *[sic]* Well, the officer started running and screaming, saying, 'oh, no, oh, no.' and Mr. Tilly *[sic]* shot him.

"*Q. [Mr. Boak]:* How many shots were fired at that time?

"*A.* Three.

"*Q.* How far away from Mr. Tilly *[sic]* was the officer at that time the first shot was fired?

"*A.* About 10 feet.

"*Q.* How many shots were fired at that time?

"*A.* Three.

"*Q.* What happened then?

"*A.* Then the officer stumbled into the little hallway that we have there and Mr. Tilly *[sic]* came in after him and fired three more shots."

\*   \*   \*

"*Q.* Did Mr. Tilly *[sic]* say anything when he fired the second three shots?

"*A.* He was saying something all the way through it; something about, 'You want to shoot somebody?' He kept repeating that.

"*Q.* You want to shoot somebody?

"*A.* Yeah.

"*Q.* When he fired the second three shots, where was he, Mr. Tilly? *[sic]*

"*A.* He was just about two feet in the doorway.

"*Q.* He was inside the outer door?

"*A.* Right."

The witness later repeated what he saw:

"*A.* I turned around and I turned back and Mr. Tilly *[sic]* had the gun in his hand.

"*Q.* Were they still at this time by the car there?

"*A.* No. They were more towards the middle of the door, but they were still far away from the door.

"*Q.* Would you tell us again what happened.

"*A.* Then the officer got up and he started running towards the door toward the hallway and Mr. Tilly *[sic]* fired three shots.

"*Q.* At that time?

"*A.* At that time.

"*Q.* Three shots were fired at the officer after he turned and before he got to the door?

"*A.* Right.

"*Q.* Was the door open?

"*A.* The door was open.

"*Q.* And the officer proceeded into the vestibule?

"*A.* Right."

* * *

"*Q.* And the officer went into the vestibule and Tilly *[sic]* followed him?

"*A.* Uh-huh (affirmative).

"*Q.* And fired three more shots?

"*A.* Yes."

We hold from this testimony that the examining magistrate did not err in binding the defendant over on the first-degree murder charge; nor did the circuit court judge err in denying the motion to quash. There is credible evidence from which the trier of fact could determine that sufficient time had elapsed for the defendant to appreciate the situation; that there was a sufficient period of time for a second look. This is true whether one considers the claim of the people that the period for premeditation began while Tilley taunted Mickel or whether one takes the more restrictive view that premeditation could only begin once Tilley got his hands on the gun. The circumstances of the shooting permit reasonable jurors to conclude that defendant Tilley did in fact premeditate and deliberate before triggering the final three shots.

Defendant places great reliance on certain language in the *Morrin* opinion to the effect that premeditation and deliberation characterize a thought process undisturbed by hot blood. In *Hoffmeister, supra,* at 159, the Court speaks of premeditation as thinking "calmly, in a cool state of mind". While thermal terms dramatically convey a distinction with a difference, are we to say that even a savage attack cannot be premeditated? We do not agree with the implication that first-degree murder comprehends only calm, cool, deliberate assassination. Such termal rationale affords a ready vehicle for reversal when the appellate court's philosophy is offended by the jury verdict.[7] To put it more bluntly, premeditation is a question of fact, not of law. We are not unmindful of respectable authority to the contrary in this state. For a classic example, see *People v Horn,* 41 Mich

---

[7] We are urged to reduce the conviction to second-degree murder as was done in *People v Hoffmeister, supra,* and many cases since.

App 755; 201 NW2d 107 (1972), *lv den,* 388 Mich
793 (1972), LEVIN, P. J., dissenting. However proof
of premeditation and deliberation has been found
sufficient in cases less compelling than this, in-
deed, sometimes in cases where there was no
eyewitness testimony. Compare *People v Meier,*
*supra, People v Treadwell,* 63 Mich App 299; 234
NW2d 494 (1975), *People v Vertin,* 56 Mich App
669; 224 NW2d 705 (1974), and *People v Oliver,* 63
Mich App 509; 234 NW2d 679 (1975).

We have dealt so far only with the sufficiency of
the evidence adduced at the preliminary examina-
tion. The proofs were more complete at trial. For
example, one witness said that after Tilley gained
control of the gun, "he was in front of the man,
and I imagine * * * to me it seemed like about *a*
*minute or maybe a little longer,* then he started
shooting". Another witness testified as to the delay
between the groups of shots, "I heard one outside
and then about maybe *three minutes* or so after
that I heard the rest on the inside of the lobby".
Thus, there was testimony from which the jurors
could find that Tilley retrieved the gun, waited
over a minute, began firing and, after the victim
survived the first volley, pursued him into the
vestibule and executed him. Such a construction of
the crime would justify a finding of premeditation.

The final and related claim of Tilley is that he is
entitled to a new trial because the jury finding
that he premeditated and deliberated is against
the great weight of the evidence. The issue is
properly preserved for appeal since defense coun-
sel filed a motion for a new trial in the lower
court. See *People v Mattison,* 26 Mich App 453;
182 NW2d 604 (1970). We are required to deter-
mine whether the trial court abused its discretion
in denying the motion for a new trial. *People v*
*Mattison, supra.* We hold it did not.

In arguing his position, defendant relies on *People v Morrin, supra,* as support for the proposition that reversal is required where the only evidence on point is as consistent with the lack of premeditation as with the presence thereof. In the *Morrin* case, the primary circumstance offered to support premeditation was a bizarre wound. We believe the factual circumstances of this case are far different, although we are willing to prognosticate that our Supreme Court will be divided on this issue. It is an issue at once cerebral and emotional and very likely to reflect the judicial philosophy of the court which addresses it.

## B (As to Moss)

Our research has uncovered no other case where two persons not aiding and abetting[8] each other have been convicted of different degrees of homicide on entirely separate legal theories for the same killing.[9]

Moss argues that the trial court erred in failing to grant the motion to quash the information and in failing, at the time of trial, to direct a verdict of acquittal on the manslaughter charge. Although separate issues are raised with respect to the proofs at the examination and trial, the facts

---

[8] *See* footnotes 2 and 3, *supra.*

[9] *People v Arnett,* 239 Mich 123; 214 NW 231 (1927), is readily distinguishable. In that case, a sheriff attempted to arrest Edgar Arnett. His brother David seized the sheriff and Edgar shot the man. The Supreme Court affirmed Edgar's conviction of second-degree murder and David's conviction of manslaughter. Despite the people's attempt to characterize that case as identical to this, examination of the *Arnett* case reveals David's guilt as an aider and abettor. In fact, he should have also been convicted of second-degree murder and was the beneficiary of a charitable jury verdict. This is so because of the Supreme Court's supposition of the jury's thoughts (239 Mich at 134), "If David had hold of the sheriff at the time the first shot was fired, *then he was a volunteer aid* in an obstruction to a lawful arrest". (Emphasis supplied.)

adduced at those two hearings are so similar that a unitary approach will suffice. The narrow question before us is one of law: were the illicit acts of Moss, in legal contemplation, the proximate cause of the deaths of Paul Mickel and Ilene Bowdle?

The people compare this misdemeanor-manslaughter case to the felony-murder situation. There are similarities, the most obvious being that each requires proof of the confluence of a death and a nonhomicidal crime. However, a review of the case authority leaves us with conviction that there is one critical distinction which provides the basis for resolution of the issue.

The felony-murder statute, MCLA 750.316; MSA 28.548, punishes all murder "committed in the perpetration, or attempt to perpetrate" one of the enumerated felonies. Except for the limitations found in *People v Austin,* 370 Mich 12; 120 NW2d 766 (1963), the questions of who caused the death of whom and how death resulted are not crucial. A robber can be convicted of a policeman's murder even when the fatal shot is fired by another policeman. *People v Podolski,* 332 Mich 508; 52 NW2d 201 (1952), *cert den,* 344 US 845; 73 S Ct 62; 97 L Ed 657, *reh den,* 344 US 888; 73 S Ct 185; 97 L Ed 687 (1952), *People v Smith,* 56 Mich App 560; 224 NW2d 676 (1974).

In 40 CJS, Homicide, § 11 b, p 854, it is said, "It is not sufficient [to sustain a conviction] that the act of accused was the cause of a condition or situation affording an opportunity for the compassing of the death by some other unconnected agency". Wharton on Homicide, § 28, p 31, as cited in *Nelson v State,* 58 Ga App 243; 198 SE 305 (1938), states: "To hold a person criminally responsible for a homicide, his act must have been the proximate cause of the death as distinguished from

the cause of a condition affording an opportunity for the compassing of the death by some other unconnected agency."

40 Am Jur 2d, Homicide, § 15, p 307 states that "if the later injury produces death, and the first, although it is the occasion of the second, does not contribute to death, the law fixes responsibility on him who dealt the subsequent blow". Further, "In the absence of conspiracy, one cannot, except in certain applications of the felony-murder doctrine, be lawfully convicted of homicide if the deceased dies from another and distinct wound inflicted by a different person", 40 Am Jur 2d, Homicide, § 17, p 307.

These principles are recognized in Michigan. In *People v Rockwell,* 39 Mich 503 (1878), defendant assaulted the deceased and knocked him to the ground where he was trampled by a nearby horse. The Supreme Court reversed defendant's conviction, apparently concluding that defendant was not liable if he merely placed the deceased in a position where death could occur at the hands of another agency.

Similar sentiments were expressed by this Court in *People v Robert Brown,* 37 Mich App 565, 569; 195 NW2d 60 (1972), *lv den,* 387 Mich 763 (1972):

"[T]he defendant cannot be found guilty of manslaughter while committing an unlawful act if death ensued as the result of the negligent acts of a third party or from a cause which is not *directly* connected with said unlawful act."

Still another case to the same effect is *People v Elder,* 100 Mich 515, 516; 59 NW 237 (1894), where the Supreme Court reversed defendant's manslaughter conviction. By implication, the court found as a matter of law that, absent aiding and

abetting, defendant would not be guilty under the following facts:

"He was a bartender, and, in an altercation with the deceased, struck him, and knocked him down, whereupon one Nixon, a bystander, kicked him, from which kick death resulted."

This Court said in *People v Flenon,* 42 Mich App 457, 460; 202 NW2d 471 (1972), *lv den,* 388 Mich 801 (1972):

"Thus, a defendant's conviction should only be sustained where there is a reasonable and *direct* causal connection between the injury and death." (Emphasis supplied.)

One is not guilty of manslaughter where one's acts only create a situation which provides the opportunity for killing by other independent means. In the instant case, the evidence does not show that defendant's behavior in fighting with Officer Mickel and resisting arrest directly caused death. Criminal liability attaches only upon proofs of causation stronger than those necessary for civil liability. While one may be liable in damages where one's acts are *"a* proximate cause", the prosecution is required to prove that a defendant's acts are *"the* proximate cause". So fundamental is this difference that our Court has twice reversed convictions where the trial court instructed on "a proximate cause" instead of "the proximate cause", the correct standard. *People v Scott,* 29 Mich App 549; 185 NW2d 576 (1971), *People v Jeglum,* 41 Mich App 247; 199 NW2d 854 (1972).

For this reason, I am compelled to conclude that Tilley's intervention was an independent, intervening cause of death which broke the causal chain

between the acts of Moss and the eventual deaths of Mickel and Bowdle. One example of an "independent intervening cause" which exculpates the defendant is grossly erroneous medical treatment, *People v Cook,* 39 Mich 236; 33 AR 380 (1878), wherein the medical treatment was found appropriate.[10] Moss is not charged with conspiracy; aiding and abetting has been ruled out. (I fear the majority opinion on this issue has obverted these crucial factors.):

"Of course, in the case of a proven conspiracy, one may be found guilty while another inflicted the wound which caused death. But in an individual case one cannot be lawfully convicted of murder when it is shown that the deceased really died from another and a distinct wound inflicted by a different person." *Walker v State,* 116 Ga 537; 42 SE 787 (1902).

Most often the intervening act cases involve some battery on the part of defendant which must be measured against the ultimate death. In one case the decedent was involved in an altercation in a bar. The defendant, with his fist, smashed the decedent's nose and knocked him to the barroom floor where he hit his head. He was subsequently dragged away by two police officers and dropped to the sidewalk. At the police station, while being searched, he went rigid, fell backwards, "his buttocks hit the floor first and then the back of his head; his head bounced about 6 inches off the floor and fell back, striking the floor a second time".

---

[10] *Cook* cited *The State v Scates,* 50 NC 420 (1858), which admitted correctness of certain authority:

"In that case the jury was charged that if one person inflicts a mortal wound, and before the assailed person dies, another person kills him by an independent act, the former is guilty of murder, and this was held error."

We question the correctness of that authority.

*People v Hebert,* 228 Cal App 2d 514, 516; 39 Cal Rptr 539, 541 (1964). The California Court reversed a conviction of involuntary manslaughter for: "The failure of the court to instruct that defendant would have been responsible for the consequences of the injuries received after * * * [decedent] was taken from the barroom only if further injury was reasonably to be anticipated, and the giving of instructions that enabled the jury to hold him responsible for later injuries even if the same were not reasonably foreseeable was prejudicial and reversible error." p 521.

I cannot subscribe to the logic of a finding that Tilley pumped six shots at his victim in two separate volleys and Moss should be held to reasonably anticipate or foresee such monstrous conduct. I perhaps could have subscribed to an aiding and abetting theory. I cannot subscribe to a conclusion that is at least as tentative as a corresponding theory consistent with innocence:

"It has been said that in a criminal case 'not only must each of the facts from which the inference is drawn be proved beyond any reasonable doubt, but the inference itself must be such as admits of no other rational conclusion' [citations omitted]. 'An inference, to be valid, must be logical [citation omitted]. It must follow as an impelling certainty from the circumstantial evidence which mothers it, or it is not proper.'" *People v Davenport,* 39 Mich App 252, 257; 197 NW2d 521 (1972).

I would hold that the conduct of Moss on this record was not the proximate cause of the deaths. I would reverse his conviction of manslaughter and remand for proceedings consistent with this opinion.

The conviction of defendant Tilley is affirmed.