PEOPLE v VERTIN

1. HOMICIDE—FIRST-DEGREE MURDER—ELEMENTS OF OFFENSE.

   The statutory offense of first-degree murder, other than felony
   murder, is the common law offense of murder, committed with
   "malice aforethought" and with an added element of premedi-
   tation or deliberation (MCLA 750.316).

2. APPEAL AND ERROR—FINDINGS OF FACT—REASONABLE INFERENCES.

   The Court of Appeals will not substitute its opinion for the
   decision of the finder of fact when the decision is based upon
   facts and reasonable inferences.

3. HOMICIDE—MURDER—FIRST-DEGREE MURDER—DELIBERATION AND
   PREMEDITATION—FACTS AND CIRCUMSTANCES—INFERENCES.

   Deliberation and premeditation can be inferred from the charac-
   ter of the weapon used, wounds inflicted, circumstances of the
   killing, and the improbability of the story told by a defendant.

4. HOMICIDE—MURDER—FIRST-DEGREE MURDER—PREMEDITATION AND
   DELIBERATION—FACTS AND CIRCUMSTANCES—REASONABLE INFER-
   ENCES.

   There were sufficient facts surrounding a homicide, including the
   weapons used and reasonable inferences based on the facts and
   circumstances, whereby the presence of premeditation and

REFERENCES FOR POINTS IN HEADNOTES

[1] 40 Am Jur 2d, Homicide § 44 *et seq.*

[2] 4 Am Jur 2d, Appeal and Error § 76.

   Formal requirements of judgment or order as regards appealability.
   73 ALR2d 250.

[3, 4] 40 Am Jur 2d, Homicide §§ 246, 263–267, 439.

   Homicide: Presumption of deliberation or premeditation from the
   circumstances attending the killing. 96 ALR2d 1435.

   Homicide: Presumption or deliberation or premeditation from the
   fact of killing. 86 ALR2d 656.

[5] 53 Am Jur, Trial § 852.

[6, 7] 29 Am Jur 2d, Evidence §§ 324, 785–788.

   Identification of accused: Admissibility of evidence of photographic
   identification as affected by allegedly suggestive identification
   procedure. 39 ALR3d 1000.

[7] 40 Am Jur 2d, Homicide §§ 416–420.

deliberation could have been well-founded in a prosecution for first-degree murder, where medical testimony revealed that the deceased was struck on the head twice with a hammer and subsequently shot twice in the chest with the bullets remaining in the body, indicating that he was lying on his back on the floor when shot, and where it appeared that there was adequate time, even before, and certainly between the blows to the head and the gunshot wounds, for the defendant to premeditate, deliberate and take a second look, and where it seemed very improbable that defendant's testimony regarding self-defense was true.

5. WITNESSES—QUESTIONING BY JURORS—JUDGES—DISCRETION—INSTRUCTIONS TO JURY—PREJUDICE.

The questioning of witnesses by jurors, and the method of submission of such questions, rests in the sound discretion of the trial court, and no prejudice occurred where a trial court instructed the jury that if it came to a point in the jury room during a recess that the jurors felt a question should be asked of a witness which had not been asked, the jury could reduce the question to writing, submit it to the court, and that the court, after a conference with both counsel, would then determine if the question was a proper one to be put to the witness and put the question to the witness if it was a proper one.

6. APPEAL AND ERROR—EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—PASSION OR PREJUDICE.

Appellate courts, in passing upon assertions of prejudice resulting from admission of photographs, must determine whether the photographs were "substantially necessary or instructive to show material facts or conditions", or merely "calculated to excite passion or prejudice".

7. HOMICIDE—MURDER—FIRST-DEGREE MURDER—EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—JUDGES—DISCRETION.

A photograph was probative and not calculated to excite passion or prejudice, and there was no abuse of discretion in allowing its admission in evidence in a prosecution for first-degree murder where it showed the deceased without shirt and unzipped pants, giving evidence to one possible theory of the time sequence, going to the element of premeditation, and where it showed two bullet holes, with no surrounding blood external, giving credence to the evidence that the body was lying prone, on its back, when the bullets entered the body.

Appeal from Livingston, Paul R. Mahinske, J.

Submitted Division 2 October 15, 1974, at Lansing. (Docket No. 18189.) Decided November 26, 1974.

Dennis L. Vertin was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Thomas Kizer, Jr.,* Prosecuting Attorney (Prosecuting Attorneys Appellate Service, *Edward R. Wilson,* Director), for the people.

*Lawrence R. Greene,* for defendant on appeal.

Before: HOLBROOK, P. J., and R. B. BURNS and BEBEAU,* JJ.

HOLBROOK, P. J. Defendant was found guilty by a jury of first-degree murder, contrary to MCLA 750.316; MSA 28.548. Defendant was sentenced to imprisonment for his natural life. The homicide involved was the death of defendant's stepfather, Donald John Vasely. Defendant here appeals as of right and raises issues which we consider in proper order.

I

Did the trial court err in denying defendant's motions to dismiss the first-degree murder charge on the basis that there was insufficient evidence to support the charge. The prosecution has stated this question as "Did the trial court err in submitting to the jury the question of whether appellant was guilty of murder in the first degree?" and has answered primarily on the basis that the prosecution requested an instruction on second-degree

---

* Circuit judge, sitting on the Court of Appeals by assignment.

murder, as well as first-degree murder, but defense counsel objected and explicitly requested instructions only on first-degree murder and not guilty.

First-degree murder is a statutory offense. It is the common law offense of murder, *i.e.,* committed with "malice aforethought", with an added element of premeditation or deliberation. *People v Morrin,* 31 Mich App 301, 324; 187 NW2d 434, 446 (1971), *lv den* 385 Mich 775 (1971). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id.* 31 Mich App at 329; 187 NW2d at 449. Also, in accord with MCLA 750.316; MSA 28.548, murder in the first degree is murder which shall be perpetrated by means of poison, lying, in wait, or committed during the perpetration or attempt to perpetrate any arson, rape, robbery, burglary, larceny of any kind, extortion or kidnapping.

In the case of *People v Meier,* 47 Mich App 179, 191–192; 209 NW2d 311, 318 (1973), this Court stated:

"Our own answer to the question of the appropriate rule to follow as to what constitutes premeditation in a first-degree murder case is not a definition. Rather, it is a reaffirmation of the role of the trier of fact in deciding the degree of guilt of an accused under the following established principles:

"(1) Premeditation can be reasonably inferred from the circumstances surrounding the killing;

"(2) A defendant may not be found guilty of first-degree murder if he did not have an opportunity to subject the nature of his response to a second look or reflection, *i.e.,* one cannot instantaneously premeditate a murder;

"(3) A sufficient time lapse to provide an opportunity for a 'second look' may be merely seconds, or minutes,

or hours, or more, dependent on the totality of the circumstances surrounding the killing;

"(4) Where it is factually clear that there is *no* evidence of premeditation, the trier of fact may not consider a charge of first-degree murder.

"Attempting to further clarify this 'definition' in the past has, we believe, led to an invasion by the appellate courts into areas rightfully left to the trial court in its factfinding processes * * * ." (Emphasis in original.) See also *People v DeRuyscher,* 29 Mich App 515; 185 NW2d 561 (1971).

We must, then, determine if there were any facts and circumstances presented including reasonable inferences whereby premeditation may have been based. See *People v Vail,* 49 Mich App 578, 590; 212 NW2d 268, 274 (1973), *lv to app granted,* 391 Mich 789 (1974).

In the early morning of March 10, 1972, the body of Donald Vasely was found in his home in Putnam Township, Livingston County. He was found near a wall in the dining area, lying on his back. There were severe wounds to his head and two bullet wounds in his chest. The deceased's brother Eugene Vasely had been living with the deceased for two years prior to the homicide.

Early in the evening of March 9, 1972, the deceased had returned to the house and requested that his brother Eugene accompany him to a local lounge for drinks. At the lounge, the deceased consumed a few drinks of beer and whiskey. The brother testified that the deceased was drunk. Thereafter, the two returned to the house and, after having some soup, the deceased went to bed.

Defendant's natural mother had been married to the deceased, but at the time of deceased's death they were divorced. Defendant had previously lived in the deceased's home for approximately 10 years. The defendant's natural father resided in

the State of Utah. Prior to his arrest on the charge herein, defendant was living with a high school friend in the friend's trailer. He had recently been fired from a job. In the late afternoon or early evening of March 9, defendant, along with two friends, went to a local bar. There they consumed several glasses of beer. They returned to the friend's trailer. Approximately an hour later, the individual who had accompanied the defendant and the owner of the trailer returned with another high school friend of defendant. The two left, with defendant and his friend going to bed. However, in attempting to leave, the friend's car became stuck in the driveway. Defendant got up and with the others helped push the car out to the road. Then, the defendant asked the driver to take him to Hell, Michigan. The friend assented, took the defendant and dropped him off a short distance from Donald Vasely's house. Defendant went to the door of the deceased's home and knocked on it. The deceased's brother came to the door and a conversation occurred, the substance of which is unclear. The defendant was invited in and stayed until a television program which the brother had been watching concluded. The two then took a short tour of the house, which was being remodeled. Testimony revealed that they passed the brother's room, which apparently was darkened, and the deceased's room where they saw the deceased lying in bed sleeping. Defendant had told Eugene that he needed gas for his automobile. The deceased's brother then drove the defendant to where the defendant's car was located. The car had been inoperable for some two to three days. Precisely what occurred when they reached the car is unclear. However, one fact is clear: that the defendant got into the brother's car, while the brother was out of the car, and drove away. The brother

then went to a home which was close by and called the police for assistance. Within approximately 20 minutes, a policeman arrived and the brother explained that his car had been taken. The policeman and the brother of deceased then drove to the parking lot of a bar where the policeman thought the car might be found. Having failed to find the car there, the two continued to the deceased's home. Upon arriving, the brother approached the door and when knocking on the door it opened. The two entered and discovered the body of the deceased. Testimony revealed that the room was in a state of disarray and that there were two separate pools of blood some distance apart. One pool of blood was located in the middle of the room, the other located where the body was found near the wall.

Later that morning, the defendant was stopped, driving Eugene Vasely's car. There was testimony showing that the defendant was calm and asked the reason for his being stopped. What was described as appearing to be blood was found on his hands and trousers. In the car was found a .410 chrome shotgun, which was later discovered to be that of the deceased. Other police had found a hammer in a small creek. Later, a young girl discovered a .22-caliber pistol lying alongside a road. This gun belonged to Eugene Vasely. He testified that it had been lying in a corner of his bedroom unloaded. The defendant testified that this was the gun used. It is single action, *i.e.,* it has to be fully cocked before each shot, as compared with a double action gun which will fire time and again, simply by pulling the trigger.

After preliminary examination defendant was bound over to the circuit court for trial on the charge of murder in the first degree. At trial,

medical testimony revealed that the blows to the deceased's head could have come from the side of the hammer. It was testified that these wounds were serious and could have caused unconsciousness. The gunshot wounds were located, one on each side of the midline of the chest at nipple level. They entered the body at a 45° upward angle. The bullets were found relatively close together under the skin of the back. One severed the aorta from which four to five quarts of blood poured into the chest cavity. The medical examiner testified that the cause of death was acute traumatic shock and hemorrhage from the wounds. He said that either of the two gunshot wounds would have killed Donald Vasely and that the one severing the aorta would have caused death quite rapidly. He further stated that once the aorta was severed the external loss of blood would have lessened markedly as blood pressure would drop tremendously, very rapidly.

The defendant testified in his own behalf. He stated that he had wished to see his stepfather that night about possible employment. He said that he believed that Eugene would think that he was trying to get a gas can when he left with Eugene's car. Defendant testified that he went back to the deceased's home, knocked on the door, waited some period of time, the deceased answered the door, that he went in and some short discussion was had. Defendant testified that the deceased had begun to talk about men involved with the defendant's mother, and then the deceased pulled a gun and said that he was going to blow the defendant's brains out. In short, the defendant asserted that a fight ensued. In pertinent parts, he testified:

"*A.* I was sitting on this couch (indicating) and Don was sitting in this chair at the table.

*  *  *

"We fought into this room (indicating on diagram) and I picked up a hammer off the floor and hit Don in the head lightly and he cursed and I hit him again pretty hard and the gun went off and there was blood over my shirt, my hand and his head and he called out to Bob.

*"Q. (By Mr. Cooper, defense attorney):* What did he do, state specifically.

*"A.* He said, 'Bob,' and then he looked at me and said, 'What's the matter baby?' Then he got up and we fought over to right here (indicating on diagram), and the gun went off again and I can't remember why, but I picked a .410 chrome-plated shotgun off the rack and I went out and held it on him and I told him to give me the gun.

*  *  *

*"Q.* You picked up a hammer you said?

*"A.* Yes.

*"Q.* Where was it?

*"A.* On the floor.

*"Q.* Where were you?

*"A.* On the floor.

*"Q.* Where was Donald Vasely?

*"A.* On the floor.

*"Q.* The two of you were on the floor at that point?

*"A.* Yes.

*"Q.* You picked up the hammer?

*"A.* Yes.

*"Q.* And you hit him?

*"A.* Yes.

*"Q.* Where?

*"A.* In the head.

*"Q.* What happened when you hit him?

*"A.* He cursed.

*"Q.* Anything else happen then?

*"A.* No.

*"Q.* You hit him again?

*"A.* Yes.

"*Q.* That is when the gun went off?

"*A.* Yes.

"*Q.* I see, and did you get to your feet at that point, do you know?

"*A.* Yes.

\*   \*   \*

"*A.* My position was on the floor lying down facing the ceiling.

"*Q. (By Mr. Gallagher, plaintiff's attorney):* What was Donald's position?

"*A.* The same.

"*Q.* On the floor on his back?

"*A.* Yes.

"*Q.* That was when the first shot was fired?

"*A.* Yes.

"*Q.* What took place between the two of you between the interval between the first and second shots?

"*A.* I tried to take the gun away from him.

"*Q.* What did you do, what physical motions did you make?

"*A.* Don picked me up in the air.

"*Q.* How much off the ground?

"*A.* Completely.

"*Q.* He was standing at this point?

"*A.* Yes.

"*Q.* He had been shot once already?

"*A.* Yes.

"*Q.* You don't know how much in the air he picked you up?

"*A.* I guess about a foot.

"*Q.* Then what happened?

"*A.* Then he carried me to the wall.

"*Q.* And then what?

"*A.* And, then the gun went off again and he laid down and called out to Bob and I dropped the hammer and he said, 'What's the matter baby,' and I went in his bedroom and took the chrome-plated shotgun off the wall and I held it on him and asked for his gun.

"*Q.* What did he say?

"*A.* He didn't say anything.

"*Q.* What was he doing?
"*A.* Coughing."

Here, as in *People v Vail, supra,* it is patent from the verdict that the jury did not believe that the defendant acted in self-defense. This Court will not substitute its opinion for the finder of facts' decision when it is based upon facts and reasonable inferences. *People v Horn,* 41 Mich App 755, 758–759; 201 NW2d 107, 108 (1972).

Deliberation and premeditation can be inferred from the character of the weapon used, wounds inflicted, circumstances of the killing, and the improbability of the story told by defendant. *People v Griner,* 30 Mich App 612, 615; 186 NW2d 800, 802 (1971), citing *People v Wolf,* 95 Mich 625; 55 NW 357 (1893). Medical testimony revealed that the deceased was first struck on the head twice with a hammer and subsequently shot twice in the chest with the bullets remaining in his body, indicating that he was lying on his back on the floor when shot. It appears that there was adequate time, even before, and certainly between the blows to the head and the gunshot wounds, for the defendant to premeditate, deliberate and take a second look. Further, it seems very improbable that defendant's testimony was true, *i.e.,* that a man who the defendant estimated to be 58 years of age, was 5′ 4″ tall and weighed 145 pounds, could pick up the heavier, approximately 6′ 3″, 20-year-old defendant off the floor after having been hit twice in the head and shot once in the chest. The motivation for taking Eugene's car also remains unexplained, unless it was inferred that defendant wished to be alone with the decedent. We rule that there were sufficient facts present surrounding the homicide including the weapons used and reasonable inferences based on such facts

and circumstances whereby the presence of premeditation and deliberation could have been well founded.

## II

Did the trial court abuse its discretion in denying defendant's motions to discontinue the procedure of allowing questions to be submitted by the jury?

In *People v Heard,* 388 Mich 182, 187–188; 200 NW2d 73, 76 (1972), the Supreme Court, speaking through Mr. Justice SWAINSON, ruled that a trial court had committed reversible error in not allowing the jurors to ask questions of witnesses. The Court said:

"We are dealing here with a very narrow issue. The trial judge in denying the motion misstated that there was no case which permitted this type of questioning. He ruled, erroneously, that under no circumstances in criminal matters, could jurors ask questions of the witnesses. We hold this view was error. The practice of permitting questions to witnesses propounded by jurors should rest in the sound discretion of the trial court. It would appear that in certain circumstances, a juror might have a question which could help unravel otherwise confusing testimony. In such a situation, it would aid the fact-finding process if a juror were permitted to ask such a question. We hold that the questioning of witnesses by jurors, and the method of submission of such questions, rests in the sound discretion of the trial court. The trial judge may permit such questioning if he wishes, and we hold that it was error for the judge to rule that under no circumstances might a juror ask any questions."

This asserted issue arose directly because of a statement of defense counsel, during his opening

statement, that "there are certain questions that are going to arise in each one of your minds during the trial that aren't going to be answered or the questions that you are thinking about aren't going to be asked". Thereafter, the trial court having been prompted by this statement, said:

"Before we go into testimony, there is one point I want to cover that was mentioned in the opening statements here. That is this business about the jurors wondering why a certain question was asked or so forth. Now, in a given circumstance when conditions are right, and I make that determination, you jurors can compose or propound a question to be put to a witness. So, if it comes to the point you are back in your—in the jury room during a recess that you feel a question should be asked of a witness who has already testified that has not been asked, you get to that stage, reduce that question to writing, what the question is of which witness, and then you give that question to the court officer. The court officer will show it to me. After conference with the defense attorney and the prosecuting attorney, I will make a determination as to whether or not that is a proper question to be put to that witness, and then, of course, we will put the witness on the stand if I determine that it is a proper question, and I will ask the question of the witness, and will receive an answer from the witness and then, of course, that little problem will be resolved for your satisfaction. So that bear in mind at all times that the question will have to be a proper question, I make that determination whether it is within or without the rules of evidence, and it must be a question that is put to a juror or put to a witness by the jury to aid and assist you in your fact-finding functions, so keep that in mind at all times whenever you are propounding a question. If there is any doubt in your mind as to whether or not it is within or without the rules of evidence, which there most likely will be, then write the question out anyway, and I will make that ruling whether it is a legitimate question or question is immaterial or otherwise incompetent."

In Anno. *Propriety of Jurors Asking Questions in Open Court During Course of Trial,* 31 ALR3d 872, 875, 882, it is said:

"Whether approving the practice of juror questioning or not, those courts refusing to find prejudicial error have either expressly or by implication recognized the subject to be highly discretionary with the trial judge, who, it is usually said, always has the best opportunity to evaluate the effects of juror questioning during the course of any given trial.

\* \* \*

"While comparatively few of the cases have explicitly formulated any general rule as to the existence of a presumption or inference that prejudice does or does not result from improper juror questioning, the cases appear to indicate that in order to justify interference by the appellate court there must be an affirmative showing that the improper questioning did actually operate to the complaining party's detriment."

In the present case, there has not been an affirmative showing that the questions operated to the defendant's detriment. Defendant points out two examples as showing that he was prejudiced by the procedure of the jury asking questions. The jury asked "What does voir dire mean" We cannot see how the explanation of what voir dire means could have possibly prejudiced the defendant. The defendant also points out that the jury asked "What bearing does the angle of the entry of both bullets have on the position, prone, standing or laying, of the deceased where the bullets entered his body?" The trial court found that this question called upon it to make a factfinding and was thus within the province of the jury. The trial court ruled that it would not invade the jury's fact-finding function and the question would not be asked. We find this to be an entirely proper ruling on the part of the trial court and no prejudice occurred.

## III

Defendant asserts the case of *People v Heard, supra,* should be reevaluated.

This we decline to do.

## IV

Finally, the defendant asserts that the admission of people's exhibit No. 1 (a photograph of the deceased's body) constituted reversible error.

The picture showed the body of the deceased in close proximity to the dining room wall; it pictured a pool of blood near the deceased's head; and, it showed the bullet holes in the deceased's chest. It has been determined that, in passing upon assertions of prejudice resulting from admission of photographs, appellate courts must determine whether the photographs were " 'substantially necessary or instructive to show material facts or conditions', or merely 'calculated to excite passion and prejudice' ". *People v Falkner,* 389 Mich 682, 685; 209 NW2d 193, 194 (1973), citing *People v Eddington,* 387 Mich 551, 562–563; 198 NW2d 297, 301 (1972), derived from 29 Am Jur 2d, Evidence, § 787, pp 860, 861.

The prosecution asserts that the photograph was important in proving separate pools of blood, as probative on the element of premeditation. We agree that the photograph was probative. The photograph, showing the deceased without shirt and unzipped pants, also aided in giving credence to one possible theory of the time sequence, again going to the element of premeditation. Further, the picture showed the two bullet holes, with no surrounding blood external, giving credence to the

evidence that the body was lying prone, on its back, when the bullets entered the body. See *People v Fullwood,* 51 Mich App 476, 482–483; 215 NW2d 594, 597 (1974).

The photograph is not particularly pleasant; however, it could not be described as ghastly or gruesome. We fail to see that it was calculated to excite passion or prejudice. *Cf. People v Musser,* 53 Mich App 683, 691; 219 NW2d 781, 785–786 (1974). Moreover, the admission of photographs is addressed to the sound discretion of the trial court. *Eddington, supra; Musser, supra.* We find here no abuse of discretion.

Affirmed.

All concurred.