PEOPLE v BROWN

Docket No. 61305. Submitted August 4, 1983, at Grand Rapids.—
Decided September 17, 1984. Leave to appeal applied for.

Defendant, Sidney V. Brown, was convicted of second-degree
murder, Calhoun Circuit Court, Stanley Everett, J. Defendant
had been charged on an open count of murder. His conviction
was the result of a second trial after his first trial ended in a
mistrial when the jurors failed to reach a verdict. Before the
second trial the prosecutor endorsed, over defendant's objection,
a witness who had not testified at the first trial. This witness
was the complainant in another case against the defendant,
who had been convicted of assault with intent to murder for
having stabbed the witness on the evening before the homicide
charged, which was also committed with a knife. Defendant's
motion to dismiss for violation of the 180-day rule was denied.
Defendant appealed. *Held:*

1. The 180-day rule was not violated. The 180-day period
began to run when defendant was sentenced for the assault
offense. The first trial began well within 180 days and several
of the delays between the first and second trials are chargeable
to the defendant. There is no indication that the second trial
was delayed by an intent on the part of the prosecution not to
ready the case for trial.

2. The testimony of the assault victim was properly admitted.
The identity of the murderer was placed in issue by the
defense, the two crimes were committed in a similar manner,
and the probative value of the evidence was not outweighed by
its prejudicial effect.

3. There was sufficient evidence of premeditation and deliber-

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 6] 29 Am Jur 2d, Evidence § 320 *et seq.*
[3] 40 Am Jur 2d, Homicide §§ 45, 52.
Modern status of rules requiring malice "aforethought," "delibera-
tion," or "premeditation," as elements of murder in the first
degree. 18 ALR4th 961.
[4, 5] 21A Am Jur 2d, Criminal Law § 849 *et seq.*
[6] 30 Am Jur 2d, Evidence § 1143.

ation to allow the jury to consider a verdict of first-degree murder.

Affirmed.

E. A. QUINNELL, J., concurred in the findings that the 180-day rule was not violated and that the evidence of premeditation was sufficient. However, he believed that admission of the similar-act testimony of the assault victim denied the defendant a fair trial. He believed that the crimes were not sufficiently similar in nature to allow the similar-act testimony for the purpose of proving the defendant's identity. He would hold that the testimony was so prejudicial as to outweigh its probative value and that the conviction should be reversed and the case remanded for a new trial.

### OPINION OF THE COURT

1. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS.

Evidence of a defendant's similar bad acts is inadmissible unless the following requirements are met: (1) there must be substantial evidence that the defendant actually perpetrated the bad act, (2) there must be some special quality or circumstance of the act tending to prove the defendant's identity, motive, intent, absence of mistake or accident, scheme, plan, system, opportunity, preparation or knowledge in doing the act, (3) one or more of these factors must be material to the determination of defendant's guilt of the charged offense, and (4) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice (MCL 768.27; MSA 28.1050; MRE 404[b]).

2. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS.

The admission of evidence of a defendant's other similar bad acts is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion.

3. HOMICIDE — FIRST-DEGREE MURDER — PREMEDITATION.

Relevant factors to be considered in ascertaining whether a defendant charged with first-degree murder acted with premeditation include: (1) the previous relationship between the parties, (2) the defendant's actions prior to the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY E. A. QUINNELL, J.

4. CRIMINAL LAW — 180-DAY RULE — BEGINNING OF 180-DAY PERIOD.

The 180-day period within which criminal proceedings on an outstanding charge are to be initiated against an inmate of a state penal institution begins to run on the date of the defendant's sentencing on another charge where the outstanding charge is pending at the time of the defendant's trial and sentencing on the other charge (MCL 780.131; MSA 28.969[1]).

5. CRIMINAL LAW — 180-DAY RULE — COMMENCEMENT OF PROCEEDINGS.

The 180-day rule does not mandate that trial be commenced on outstanding charges against an inmate of a penal institution within that time; rather, the prosecution is obligated to initiate proceedings promptly and in good faith and thereafter to take good-faith action to proceed promptly in readying the case for trial (MCL 780.131; MSA 28.969[1]).

6. See headnote 1 *supra.*

7. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS — IDENTITY OF DEFENDANT.

*Evidence of a defendant's similar acts, when offered to show the identity of the defendant, should show a high degree of similarity in the manner in which the crime charged and the other crimes were committed; the prosecution has the burden of showing that the manner in which the crime charged and the other crimes were committed had characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of the defendant.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Conrad J. Sindt,* Prosecuting Attorney, and *Michael J. Berezowsky,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *P. E. Bennett),* for defendant on appeal.

Before: V. J. BRENNAN, P.J., and SHEPHERD and E. A. QUINNELL,* JJ.

V. J. BRENNAN, P.J. Defendant-appellant, Sidney

* Circuit judge, sitting on the Court of Appeals by assignment.

Brown, was charged with an open count of murder, MCL 750.316; MSA 28.548, for the death of Brenda Day, who died from a neck laceration. He was ultimately convicted of second-degree murder, MCL 750.317; MSA 28.549, after a six-day jury trial commencing on August 26, 1981, and ending on September 2, 1981. Defendant was sentenced to a term of life imprisonment and appeals as of right.

Defendant's first trial on the charge began on March 3, 1981. The trial lasted ten days and ended in a mistrial when the jurors were unable to reach a verdict.

Before the second trial, the prosecutor moved to endorse four witnesses who had not testified at the first trial. One witness requested was Beverly Mandoka, who was the complainant in another case against defendant. In the *Mandoka* case, defendant had been charged and convicted of assault with intent to murder for stabbing Mandoka on July 9, 1980, the evening before the instant offense. That conviction has been affirmed by this Court. After an evidentiary hearing on August 7, 1981, over defendant's objections, Mandoka was endorsed as a witness while the other proposed witnesses were not endorsed.

At defendant's second trial, defendant moved to dismiss the case for violation of the 180-day rule, MCL 780.131; MSA 28.969(1). The trial court denied defendant's motion to dismiss, finding that the people had "met the requirements of the statute by bringing it to trial within six months and by retrying it within six months of the time the first jury was discharged".

On July 9, 1980, the decedent, Day, was living with her cousin, Dianne Mandoka, in an apartment on Champion Street in Battle Creek. That

evening, around 8:00 p.m., Day was in the Park-view Bar several blocks from her apartment when she met Victor Boone. Boone offered to buy her a drink and the two of them danced together. After Boone returned from a trip to the bathroom, he found defendant talking with Day at the bar. Defendant appeared angry and told Boone to wait until he got through talking with Day.

Boone and a friend, Jerome Watkins, left the bar and started walking. When they passed the apartment building on Champion Street they saw Day's roommate, Dianne Mandoka, sitting out on the porch and drinking with Francisco Lopez, so they walked up to the porch. Boone went inside the apartment to talk with the two little girls living there. Watkins stayed on the porch, but soon got into an argument with Lopez and left. Thereafter, one of the little girls came into the house and said, "My mother's out there bleeding". Boone testified that he went downstairs and saw Day lying on the ground. Dianne Mandoka had also gone downstairs to attend to Day. Boone also noticed defendant walking away from the scene. He and Francisco Lopez caught up to defendant, and Boone asked him why he cut the girl, to which defendant turned around and allegedly responded, "Do you want part of this?" Defendant had a bloody knife in his right hand. Boone then called the police and observed defendant enter the Hart Hotel a short distance away. Boone led the police into the hotel, struck defendant on the side of the face, and the police placed both Boone and defendant under arrest. Jerome Watkins was also arrested.

Dianne Mandoka testified that around 12:30 a.m. Lopez came over to the apartment. A couple of hours later, Watkins and Boone arrived and

then defendant and Day came walking back to the apartment at about 2:30 a.m. Each was carrying a beer. Mandoka stated that defendant and Day were holding hands and laughing. Lopez also testified that the couple appeared to be having a good time together holding hands and laughing as they walked. When they walked up to the porch, Day sat on Lopez's lap and kissed his cheek. Defendant saw Boone through the apartment window and said to Day, "There's that Motherfucker you was dancin' with." Dianne Mandoka and Myra Day, the victim's niece, both testified that defendant asked day to go downstairs so that he could talk to her. Lopez stated that defendant said he had to leave the apartment and Day could go with him if she wanted. Watkins testified that defendant told Day, "I'm tired of this shit. I want to talk to you." Watkins left and went to the Hart Hotel.

Defendant and Brenda Day walked downstairs together. Both Dianne Mandoka and Day's brother-in-law, Harold Morseau, who lived below them, stated that they heard Day say, "Quit, Sidney." Mandoka stood up and looked over the railing to see Day lying on the ground and defendant standing by her. She could see blood coming from the victim's left ear. She then went downstairs. According to Mandoka, Lopez asked defendant what he had done, to which defendant allegedly stated, "You can have her now." Lopez stated defendant answered, "Why don't you go and ask her."

Lopez testified that he came down the stairs and saw Day and defendant fighting with each other at the base of the steps. Lopez saw defendant hit Day once on the neck, and she immediately fell down, but he did not see anything in defendant's hand at this time. Lopez pursued defendant at the behest

of Mandoka. Boone, who was also in the area, hollered to "watch out" because defendant had a knife. Lopez then noticed defendant did have a knife in his right hand. He went to his car and obtained a knife to follow defendant. Boone and Lopez followed defendant several blocks to the Hart Hotel. by this time, the police were right behind them. Battle Creek police officer Robert Baker testified that Boone accused defendant of stabbing Day. In reply, Baker stated that defendant said, "Yea, Motherfucker, I did and you're lucky it wasn't you." Officer Hattis testified to hearing a similar remark. The police subsequently arrested defendant and Boone. Outside they also arrested Jerome Watkins, who was carrying a meat cleaver in his sock. Watkins also had a .22 caliber automatic pistol in his pants, but discarded it before the police arrived.

Lopez took the police back to the apartment building to help Day. During the trip, he threw away the knife he was carrying. Police later found that knife and confronted Lopez with it. He admitted it was his. Defendant did not have any weapons on him when arrested, but a knife with human blood on it was found on the counter in the lobby of the Hart Hotel near where Boone and Lopez confronted him. Donald Krupp, a forensic scientist, ran tests on the two knives and meat cleaver. There was no trace of blood on Lopez's knife or the meat cleaver. The knife found on the counter contained type B human blood.

Paula Day, the victim's sister, stated that defendant and Brenda had lived together off and on, but had broken up a few weeks before the incident. Cheryl Morseau, another of the victim's sisters, testified similarly. She also testified that she was awakened around 2:30 a.m. on July 10, 1980, and

then heard defendant exclaim to someone, "You can have her now," as he was walking away.

The pathologist who performed the autopsy, Dr. Malcolm Young, testified that Day had a laceration of the left side of the neck between the jaw and bony process of the skull. The wound was caused by a stabbing with a thin, sharp, instrument such as a knife, a piece of glass or even a thin piece of wood. The stab cut one or more of the blood vessels in the neck and caused Day to bleed to death. The cut on the neck was vertical, with "clean" or straight edges. It was three-quarters of an inch long and two and one-quarter inches deep.

Detectives Erick Bush and Robert Belote of the Battle Creek Police Department testified that they interviewed defendant about 5:00 a.m., a few hours after his arrest. There were two sessions. An audio recording was made of both. The second session was held soon after the first one because the first tape was inaudible. Bush and Belote attested that defendant appeared alert and in control of himself and that he did not appear to be intoxicated.

Beverly Mandoka testified that she was divorced from defendant in March, 1979. However, in July, 1980, she was living again with him. On July 9, 1980, at about 6:00 p.m., Mandoka told him that it was all over between them and that he had to leave. She told him this because he was seeing Brenda Day, but did not relate to defendant that this was the reason. Defendant left the living room where he had been sitting on the couch and went to collect his clothing. He came out of the bedroom with a knife in his hand. He stabbed Mandoka four times, one of the times being on the left side of the neck. She was also stabbed once on her shoulder and twice on her breast.

Defendant raises several allegations of error,

none of which require reversal. We agree with Judge QUINNELL that the 180-day rule was not violated and we adopt his analysis on this issue. However, we disagree with his determination that admission of Beverly Mandoka's similar-act testimony was reversible error.

Both incidents occurred after defendant had been rejected by a woman. In both he made statements indicating his displeasure with the turn of events, and both times he made remarks afterwards indicating that his actions were in retribution for the rejection. Defendant stabbed both women in the left side of the neck, just below the ear. Moreover, the prior act established defendant's possession of a knife and, thus, opportunity. It showed his identity and scheme or system in doing the act, *i.e.,* stabbing an unfaithful partner in the neck. Careful instructions were given the jury to minimize prejudice to the defendant. We find that there was no abuse of discretion in allowing this testimony.

*People v Wilkins,* 82 Mich App 260, 267-268; 266 NW2d 781 (1978), *rev'd on other grounds* 408 Mich 69; 288 NW2d 583 (1980), sets forth the requirements that must be met before evidence of other similar bad acts may be introduced at trial. First, there must be substantial evidence that defendant actually committed the other acts. Second, there must be some special circumstances pertaining to the similar acts which tend to prove defendant's motive, intent, absence of mistake or accident, scheme, plan or system in committing the charged offense. MCL 768.27; MSA 18.1050. MRE 404(b) adds opportunity, preparation, knowledge and identity to this list. Finally, such factor must be material to the determination of defendant's guilt of the charged offense. In other words, evidence of

similar bad acts may only be admitted when the element of which they are probative is genuinely disputed. *People v Golochowicz,* 413 Mich 298; 319 NW2d 518 (1982). The admission of similar-act testimony is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion.

Identity was placed in issue during defense counsel's opening statement and through cross-examiantion. There were four men present at the apartment that night and Jerome Watkins's whereabouts was unknown. Watkins had a meat cleaver in his possession. Defendant's theory of defense was that the people had not shown beyond a reasonable doubt that defendant, and not one of the other men or even an accident, was the cause of Day's death. Identity, therefore, was genuinely controverted. There was also no doubt that defendant was Mandoka's assailant.

Thus, the second requirement, that the acts have some special quality of similarity, and a fourth requirement, that the probative value outweighs the prejudicial effect, must be examined. The prosecution argues that both incidents occurred after defendant had been rejected in some manner by a woman. The stabbing was also identical in that the laceration was located on the neck under the left ear, an area which can be said to be calculated to cause death, as well as the fact that the victims were intimately known by the defendant. In both instances, the assailant faced the victim (Mandoka stated that she could see defendant as he hit her and Lopez attested that he saw defendant facing Day). Furthermore, while possession of a knife is not a separate rationale justifying admission of similar-act testimony, it serves to further indicate identify. As in *Golochowicz, supra,*

p 322, it is a close question as to whether the similarity of the acts suggests a *modus operandi,* and the decision on such a close question does not suggest an abuse of discretion.

Turning to the final prerequisite, whether the probative value outweighed its prejudicial effect, we believe that the instant case is distinguishable from *Golochowicz, supra,* where the Supreme court held that the evidence was more unfairly prejudicial than probative of identity. First, the similarity of the offenses in *Golochowicz,* while close, was not as strong as here. *Golochowicz* dealt with a murder case where both victims had been strangled, but the similar-act victim had also been brutally beaten. Here, no such significant difference existed. Moreover, here the trial court took special care not only to give cautionary instructions at the beginning and close of trial concerning similar-act testimony but also interrupted Mandoka's testimony and emphasized again its limited purpose. Such would have a mitigating effect on the prejudice to defendant.

Finally, and most importantly, is the fact that not only was the similar-act testimony in *Golochowicz* more dissimilar because the victim was also beaten, but the nature of that killing, described by the court as "distracting, indeed horrifying", was particularly gruesome and, thus, highly prejudicial. Here, the fact that Mandoka survived makes the evidence of her incident with defendant less likely to be so inflammatory as to distract the jury unduly. For these reasons, we conclude that it was not an abuse of discretion to allow Mandoka to testify concerning her being stabbed by defendant.

Defendant also argues that there was insufficient evidence on premeditation and deliberation to support a first-degree murder instruction.

In Michigan, murder " 'is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the state, with malice prepense or aforethought, either express or implied.' " *People v Aaron,* 409 Mich 672, 713; 299 NW2d 304 (1980), quoting *People v Potter,* 5 Mich 1 (1858). First-degree murder involves the additional element of premeditation or deliberation. *People v Vertin,* 56 Mich App 669, 672; 224 NW2d 705 (1974). Premeditation is measured in time; time to permit a reasonable person to subject the nature of his response to a second look. In this connection, relevant factors in ascertaining whether an accused took "a second look" include: (1) the previous relationship between the parties; (2) the accused's actions prior to the killing; (3) circumstances of the killing itself; and (4) the accused's conduct after the homicide. *People v Jeffrey Johnson,* 113 Mich App 650, 661; 318 NW2d 525 (1982), *lv den* 417 Mich 1100.2 (1983).

Defendant contends that at the time the prosecution rested and defendant moved for a directed verdict, there was insufficient evidence of premeditation or deliberation. Therefore, the present inquiry is whether the evidence produced at trial at the time of defendant's motion for directed verdict, viewed in a light most favorable to the prosecution, was sufficient enough that "a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt". *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979), *cert den* 449 US 885 (1980). Here, the nature of the killing, a stabbing, is sufficient to allow the jury to infer malice. In any event, defendant only challenges the sufficiency of evidence with respect to the element of premeditation or deliberation.

As to the element of premeditation, we find that there was more than sufficient evidence under the standards announced in *Hampton, supra.*

After a review of the record, we find that the other allegations of error are without merit.

Affirmed.

SHEPHERD, J., concurred.

E. A. QUINNELL, J. *(concurring in part, dissenting in part).* I respectfully dissent from the majority's conclusion that evidence concerning the stabbing of Beverly Mandoka was properly admitted. I agree with the majority's resolution of the other issues presented, and the discussion of the 180-day rule contained in this opinion represents the unanimous view of the panel.

I

180-DAY RULE

Defendant argues that the trial court lost jurisdiction to try him through delay. At the outset, it should be noted that defendant is not asserting a violation of his constitutional and statutory right to a speedy trial, US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MSA 28.1024. Defendant's claim of error is based on the 180-day rule of MCL 780.131; MSA 28.969(1), which requires the state to bring an accused to trial within 180 days after the issuance of a warrant, indictment, information, or complaint on any untried offense, where the accused is an inmate of a penal institution of the state.

Defendant was arrested for the instant offense on July 10, 1980, and a warrant was issued promptly thereafter. Defendant also was charged

with an assault on his ex-wife, Beverly Mandoka, the date of the offense being charged as July 9, 1980. Defendant was tried and convicted regarding that assault charge, and on December 1, 1980, he was sentenced to the jurisdiction of the Department of Corrections. The 180-day period therefore began on December 1, 1980; *People v Hill,* 402 Mich 272, 280-281; 262 NW2d 641 (1978). Defendant's trial on the instant charge began March 3, 1981. After ten trial days, a mistrial was declared on March 17, 1981, when the jury in that case could not agree upon a verdict.

On April 28, 1981, the defendant filed a motion to dismiss or, in the alternative, to reduce the charge to second-degree murder. Various portions of the trial transcript were ordered, and the motion was heard on June 1, 1981. On July 9, 1981, the defendant was returned to court and his motions were denied. Trial was then scheduled for July 28, 1981. On July 13, 1981, the prosecution filed some additional motions, and the defendant also filed a motion for an evidentiary hearing, noticed for hearing on July 20; on July 16 the defendant filed a petition for funds for an investigator, also noticed for hearing on July 20.

For reasons not set forth in the record, the trial was not held on July 28 as originally scheduled, but was scheduled as a backup case for the week of August, 18, 1981, and also as a backup case for the week of August 25, 1981. Trial commenced on August 25, 1981, some 161 days after the end of the first trial, and 248 days from the time the 180-day period began to run.

The 180-day rule, however, does not mandate that trial be commenced within that period of time. Rather, it obligates the prosecution to initiate the proceedings promptly and in good faith,

and thereafter to take good faith action to proceed promptly in readying the case for trial. *People v Hendershot,* 357 Mich 300, 303-304; 98 NW2d 568 (1959).

There is nothing in the foregoing calendar of events to indicate an absence of good faith on the part of the prosecution as to either requirement. The first trial began well within the 180 days. Thereafter some periods of time are chargeable to the defendant rather than to the prosecution. The first trial itself consumed 14 days. From the time the defendant's initial motion to dismiss was made on April 28, 1981, and the necessary transcripts were prepared and the motion argued and an order entered, an additional 72 days expired. An additional seven days were required to process defendant's July, 1981, motions. Thus, there are at least 93 days chargeable to the defendant and not to the prosecution. There is no indication that the delay in commencing the second trial was caused by an intent on the part of the prosecution not to ready the case for trial.

The trial court apparently held that the 180-day statute had not been violated because the second trial was commenced within 180 days after the mistrial had been declared in the first trial. We need not here decide whether that is the correct interpretation of the rule.

## II

### SIMILAR-ACT EVIDENCE

Evidence was introduced at the trial that defendant had lived intermittently with both Brenda Day and his ex-wife, Beverly Mandoka, prior to the date Brenda Day was killed. On the evening preceding and in the early morning hours of July

10, 1980, defendant and Day had been at a local tavern. Testimony was presented that defendant had reacted in an angry and jealous manner to Brenda Day's having danced with another man.

Nevertheless, there was also testimony that the two were on very friendly terms when they returned to the apartment house where Brenda Day was staying. Once there, Brenda Day sat in another man's lap and kissed that man. Testimony was presented which, if believed, would establish that defendant angrily and rudely asked Day to go downstairs so he could talk to her; that in the downstairs area Day was heard to say "Quit, Sidney"; that shortly thereafter Day was found lying in front of the apartment building bleeding. Testimony of other witnesses, if believed, would establish that defendant thereafter but prior to his arrest made statements to other persons, the only reasonable inference from such statements being that he was responsible for stabbing Ms. Day.

Ms. Day died of a single stab wound to the left side of her neck. The autopsy pathologist described the wound as follows:

"There was a laceration through the skin in the left side of the neck which was situated below the earlobe and was between the angle of the mandible, or lower jaw, and the mastoid process of the skull.

\* \* \*

"The small space between the angle of the mandible or lower jawbone and [the] styloid process of the skull contains three blood vessels that are major. There is the external carotid artery, the internal carotid artery, and the internal carotid vein. There is barely any other room in that space available other than those three structures and it was my conclusion that one or more of them had been severed by the wound, and any one of them being severed would cause severe blood loss, and

it was my conclusion that death was due to [exsanguination], or severance, of one or more of those vessels."

Over defense objections, Beverly Mandoka was permitted to testify that on July 9, 1980, the defendant had stabbed her on the left side of the neck; noteworthy is her additional testimony that the defendant also inflicted cut wounds to her shoulder, her left hand, and two wounds on her breast.

The admissibility of such evidence is governed now by MRE 404(b):

"(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material * * *."

*People v Golochowicz,* 413 Mich 298; 319 NW2d 518 (1982), was decided after the defendant's second trial. Having the benefit of the analysis found in *Golochowicz,* I would conclude that the trial court committed reversible error in permitting the testimony of Beverly Mandoka. See also *People v Betancourt,* 120 Mich App 58; 327 NW2d 390 (1982), and *People v Urbin,* 121 Mich App 274; 328 NW2d 361 (1982). *Golochowicz,* citing approvingly *People v Wilkins,* 82 Mich App 260; 266 NW2d 781 (1978), establishes that the rule allowing proof of similar acts is an exception to the general rule that such evidence is not admissible. Before such evidence becomes admissible, four preliminary considerations must each be satisfied. At 413 Mich

309, the Supreme Court identified the factors as follows:

"(1) there must be substantial evidence that the defendant actually perpetrated the bad act sought to be introduced; (2) there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act and, in light of the slightly different language of MRE 404(b) we add, opportunity, preparation and knowledge; (3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice."

The testimony of Ms. Mandoka constitutes substantial evidence that defendant actually perpetrated the assault on her. However, when asked at trial to specify the material factors as the basis for admission of similar-acts evidence, the trial prosecutor responded with a " 'shotgun' fusillade", a type of response criticized by the Supreme Court in *Golochowicz* at 413 Mich 315. On brief in this Court, the prosecution has sinned at least partially in this regard. The following appears in the prosecutor's brief:

"Evidence of defendant's assault on Beverly Mandoka hours earlier was properly introduced to establish motive, opportunity, intent, scheme or plan, identity of the assailant, and lack of accident. The evidence was particularly probative in light of defendant's argument that the victim was injured as a result of her own fall or was stabbed by others."

This type of argument, of course, is not helpful to either a trial or appellate court in determining the admissibility of similar-act evidence.

None of the factors on which the prosecution relies is material except for identity. There was no special quality or circumstance of the Mandoka assault tending to show a motive for defendant to stab Day. The two crimes arguably involved similar motives, but such a similarity merely suggests that defendant's character was such that he was likely to commit such crimes, precisely what MRE 404(b) forbids.

The prosecution explains "opportunity" by saying that the Mandoka assault showed that defendant possessed a knife. However, Mandoka was unable to give any description whatever of the knife used against her. Because knives are ordinary household objects readily accessible to nearly everyone, the probative value of evidence that defendant possessed a knife of unknown description on the day before Day was stabbed was virtually worthless.

The prosecution offers no explanation of how the Mandoka assault tends to show intent or how intent is material. The references by the prosecution and the majority to a "scheme or plan" are inexplicable. There is no evidence whatever to suggest that defendant committed these crimes as part of some scheme or plan to stab his women friends in their necks.

The prosecution explains "lack of accident" by pointing to argument by defendant's counsel that Day's wound could have been caused by accidentally falling down a flight of stairs onto a sliver of wood or glass. The statute which governed admission of such evidence at the time of trial and before the rule took effect, MCL 768.27; MSA 28.1050, expressly limited use of such evidence to showing lack of accident on the part of *defendant.* I do not believe MRE 404(b) was intended to change this aspect of the law.

In *Golochowicz, supra,* pp 324-326, the Court emphasized the necessity for extreme caution in admitting similar-act evidence to show identity:

"[T]his case presents the classic example as to why trial courts should be

" 'stricter in applying [the] standards of relevancy when the ultimate purpose of the [evidence] is to prove identity or the doing by the accused of the criminal act charged than they are when the evidence is offered on the ultimate issue of knowledge, intent or other state of mind.' McCormick, Evidence (2d ed), § 190, p 452.

"As a general rule, if the evidence of the accused's identity as the perpetrator of the crime in question is strong or essentially uncontroverted, there is no need for evidence of other crimes to prove identity, which evidence is only circumstantial at best. On the other hand, if evidence of the identity of the criminal actor is weak or tenous, revelation that he has committed an unrelated similar crime may, by reason of its tendency to distract the jury from the identification issue, tempt it to compromise or ignore that critical element of the case while focusing on the clearer proof of the defendant's other misconduct. The dangerous result may well be, and indeed is likely to be, the jury's conclusion that whatever the strength of the identification evidence in the case, the defendant is demonstrably a bad person and should be imprisoned anyway.

"It is, at least in part, for those reasons that the trial court, when similar-acts evidence is offered to prove *identity,* should insist upon a showing of a high degree of similarity in the manner in which the crime in issue and the other crimes were committed. We regard the requirement to be a heavy burden upon the prosecution to show that the manner in which the crime charged and the other crimes were committed was marked with special characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of the defendant because all bore his distinctive style or 'touch'.

"Even where evidence of that distinctiveness is produced, a trial court should be especially alert to the

paramount consideration that ruling on the admission of such evidence is more a matter of a careful weighing process in the exercise of discretion than the mechanical application of a rule. The overriding policy is to protect the accused from unfair prejudice. That policy can be carried out only if the trial court is alertly sensitive to the need to balance the probative value of the proffered evidence against its prejudicial impact by weighing the likelihood that, as Professor McCormick put it, the jury will 'be roused by the evidence to overmastering hostility'." (Footnote omitted; emphasis in original.)

See also *People v Major,* 407 Mich 394, 398-399; 285 NW2d 660 (1979):

"It is the distinguishing characteristics which constitute the acts as similar within the meaning of MCL 768.27 and MRE 404(b), not the fact that all constitute the same crime or are violative of the same statute. The distinguishing, peculiar or special characteristics which are common to the acts and thus personalize them are said to be the defendant's 'signature' which *identifies* him as the perpetrator".

The evidence in this case fails to demonstrate that high degree of similarity between the charged crime and the prior bad act, and further, the similarities present are not particularly distinctive. Jealously among lovers is an extremely common motive for violence. Knives are common household utensils and also are extremely common weapons. The neck is a vulnerable part of the anatomy and a common site for a knife wound. Wounds inflicted by a right-handed assailant to a face-to-face victim would in all probability be on the victim's left side.

If both victims had received an identical stab wound to the very precise location required to

cause the death of Brenda Day, similarity would be enhanced. However, Mandoka's testimony showed that, in contrast to the single serious wound received by Day, she received five relatively superficial wounds, only one of which was inflicted on the same region of the body as the wound received by Day. The majority misstates the record by claiming that defendant stabbed both Day and Mandoka just below the ear. Mandoka merely testified that defendant stabbed her in the left side of her neck. She pointed out the precise spot to the jury, but, of course, the record does not show where she pointed. However, comparison of the testimony of the pathologist who examined Day with the testimony of Mandoka shows that Mandoka could not have been stabbed in the same spot as Day. The pathologist testified that Day was stabbed in a small space between the lower jaw bone and the styloid process of the skull which contains three major blood vessels, the external carotid artery, the internal carotid artery, and the internal jugular vein. These three vessels pass through such a confined space that it is inconceivable that a stabbing there could miss all three. According to the pathologist, if one of the arteries in that space were severed, death would result in a very few minutes unless the victim received immediate medical treatment. If only the vein was severed, death would result within 20 or 30 minutes. Mandoka's testimony revealed no life-threatening injury. The ambulance which took her to the hospital was delayed and came only in response to a second call. Mandoka was treated and released the same night. Because Mandoka's wound was not remotely comparable in severity to that received by Day, she could not have been stabbed in the same spot as Day.

Because the two crimes did not have "distin-

guishing, peculiar or special" characteristics in common as required by *Major,* I would not hesitate to say that the trial judge abused his discretion by finding that Mandoka assault sufficiently similar to the Day stabbing, even under the extraordinarily severe standard for determining when an abuse of discretion occurs stated in *People v Talley,* 410 Mich 378, 387; 301 NW2d 809 (1981). Compare *Golochowicz, supra,* p 322. However, even if no abuse of discretion was presented, I would hold that the evidence of the Mandoka assault was so unfairly prejudicial when weighed against its limited and tenuous probative value that its admission denied defendant a fair trial. See *Golochowicz* at 413 Mich 323.

I would reverse and remand for a new trial at which this evidence would not be admitted.